ZACHARY, Judge.
 

 *132
 
 Plaintiffs, minority unit owners in a condominium complex, appeal from the trial court's order granting defendants' motions to dismiss plaintiffs' claims for breach of contract, breach of statutory obligations, breach of fiduciary duty, piercing the corporate veil, and unfair and deceptive trade practices. We reverse the trial court's dismissal of plaintiffs' claims for breach of fiduciary duty and piercing the corporate veil, but affirm as to the trial court's dismissal of the claims for breach of contract, breach of statutory obligations, and unfair and deceptive trade practices.
 

 Background
 

 I. The North Carolina Condominium Act
 

 The instant dispute arose in the context of Chapter 47C of the North Carolina General Statutes ("the Condominium Act"), which provides,
 
 inter alia
 
 , a process by which condominium unit owners may terminate and sell a condominium development. Pursuant thereto, "a
 
 *133
 
 condominium may be terminated only by agreement of unit owners of units to which at least eighty percent (80%) of the votes in the association are allocated, or any larger percentage the declaration specifies." N.C. Gen. Stat. § 47C-2-118(a) (2017). The "agreement to terminate must be evidenced by the execution of a termination agreement ... in the same manner as a deed, by the requisite number of unit owners." N.C. Gen. Stat. § 47C-2-118(b). In addition, the termination agreement "must be recorded in every county in which a portion of the condominium is situated, and is effective only upon recordation."
 
 Id.
 
 In the event that "any real estate in the condominium is to be sold following termination, title to that real estate, upon termination, vests in the association as trustee for the holders of all interests in the units. Thereafter, the association has all powers necessary and appropriate to effect the sale." N.C. Gen. Stat. § 47C-2-118(e). "[T]he minimum terms of the sale" must also be set forth in the termination agreement. N.C. Gen. Stat. § 47C-2-118(c). "Proceeds of the sale must be distributed to unit owners and lienholders as their interests may appear, in proportion to the respective interests of unit owners as provided in subsection (h)." N.C. Gen. Stat. § 47C-2-118(e). Subsection (h) provides, in relevant part:
 

 (1) Except as provided in paragraph (2), the respective interests of unit owners are the fair market value of their units, limited common elements, and common element interests immediately before the termination, as determined by one or more independent appraisers selected by the association. The decision of the independent appraisers shall be distributed to the unit owners and becomes final unless disapproved within 30 days after distribution by unit owners of units to which twenty-five percent (25%) of the votes in the association are allocated. The proportion of any unit owner's interest to that of all unit owners is determined by dividing the fair market value of that unit owner's unit and common element interest by the total fair
 
 *445
 
 market values of all the units and common elements.
 

 N.C. Gen. Stat. § 47C-2-118(h)(1).
 

 II. Termination and Sale of the Links Club Condominium
 

 On 25 April 2001, the Links Club Condominium ("the Condominium") was created by recording a Declaration of Covenants, Conditions, and Restrictions in the Wake County Register of Deeds. At the same time, Links Club Condominium Association ("the Association") was created pursuant to the Condominium Act "to manage the Condominium on
 
 *134
 
 behalf of all of the condominium unit owners." As of September 2009, there were 264 units within the Condominium. By July 2016, close to eighty percent of the Condominium units were owned by affiliated entities known as the Fairway Apartments, LLC, "which collectively operated a portion of the Condominium as an apartment complex." The remaining units were owned by individual unit owners, some of whom are the plaintiffs in the instant case (hereafter "minority owners" or "plaintiffs").
 

 On 26 July 2016, defendant FCP Fund III Trust ("FCP Fund"), a Maryland real estate investment trust operated by defendant Thomas A. Carr, formed defendant Links Raleigh, LLC. Plaintiffs allege that before FCP Fund formed Links Raleigh, FCP Fund had "arranged for or contracted with Fairway Apartments to purchase their units in the Condominium" and "intended to purchase, through Links Raleigh or some other entity under its control, the units owned by Fairway Apartments" as well as "additional units until it owned 80 percent of the units in the Condominium."
 

 Plaintiffs allege that on 31 August 2016, defendant Alex Cathcart, "in furtherance of FCP Fund's plan, acting as a representative of Links Raleigh, and with proxies provided by Fairway Apartments, conducted a special meeting of the Association[.]" At that meeting, all members of the Association's Board of Directors were removed, and the number of Directors was reduced to three. Defendants Cathcart, FCP employee Nason Khomassi, and Senior Vice-President of FCP Bryan M. Kane were elected as the new members of the Association's Board of Directors.
 

 By 28 February 2017, Links Raleigh had purchased 212 of the 264 Condominium units, giving it an 80.3% ownership interest. At that point, Links Raleigh, under the control of FCP Fund, had obtained a sufficient ownership interest to terminate the Condominium pursuant to N.C. Gen. Stat. § 47C-2-118. Accordingly, also on 28 February 2017, Links Raleigh sent a letter to the owners of the remaining units alerting them that it intended to terminate the Condominium and that upon termination, "all 264 units and common elements ... will be sold to an entity owned and controlled by an affiliate of Links Raleigh, LLC and converted into a rental apartment community." Links Raleigh "offered ... to permit owners to remain at the Links as [tenants], and ... offered to honor existing third party leases by unit owners, so long as they were at market rates and terms."
 

 On 17 May 2017, in accordance with the provisions of N.C. Gen. Stat. § 47C-2-118(b), Links Raleigh prepared and recorded a Plan
 
 *135
 
 of Termination of Condominium and Agreement ("Termination Agreement"). In addition to memorializing the termination, the Termination Agreement set forth various provisions concerning the sale and valuation of the Condominium. Particularly, Section 2 of the Termination Agreement provided, in pertinent part, that:
 

 The Association shall offer to sell the Property for a price of not less than $26,000,000.00 Twenty-Six Million Dollars, or for the Appraised Value (as that value is determined by the method set forth in Section 6), whichever is greater, and may contract for sale of the Property to any qualified purchaser, on commercially reasonable terms, for any amount in excess of $26,000,000.00 (Twenty-Six Million Dollars).
 

 As referenced above, Section 6, titled "Determination Of Value Of the Property As A Whole," provided that "[t]he Association shall contract with one or more independent appraisers licensed in the state of North Carolina to determine the fair market value of the Property as a whole...." Section 5 governed the "Determination Of Respective
 
 *446
 
 Interests" subsequent to sale, and provided,
 
 inter alia
 
 , that "the respective interests of the unit owners, for purposes of distribution of the net proceeds of the sale of the Property" shall be determined by an allocation appraisal-that is, an appraisal "of the fair market value of the units, limited common elements, and common element interests, immediately before the termination" as provided for under N.C. Gen. Stat. § 47C-2-118(h).
 

 In accordance with N.C. Gen. Stat. § 47C-2-118(h) and Section 5 of the Termination Agreement, on 2 May 2017 Links Raleigh hired a third-party appraiser to independently and separately value each of the 51 units still owned by the minority owners ("Owners Appraisal"). A separate, limited appraisal of the independent values of some of the units owned by Links Raleigh was also conducted ("Links Raleigh Appraisal"). Collectively, both appraisals constituted the Allocation Appraisal-i.e., the appraisal of "the fair market value of the units, limited common elements, and common element interests, immediately before termination"-for purposes of distributing the net sale proceeds pursuant to N.C. Gen. Stat. § 47C-2-118(h) and Section 5 of the Termination Agreement. Together, the Allocation Appraisal values totaled $27,080,000.00. Pursuant to Section 5 of the Termination Agreement, the Allocation Appraisal was to be used "only for purposes of distribution of the net proceeds of the sale of the Property."
 

 The Association, however, never secured an appraisal of the fair market value of the Condominium as a whole, as required by Sections
 
 *136
 
 2 and 6 of the Termination Agreement. Instead, on 31 May 2017, the Association sold the Condominium to Greens at Tryon, LLC-another company wholly owned by FCP Fund-for the Allocation Appraisal values: $27,080,000.00. Plaintiffs contend that the value reflected in the Allocation Appraisals was not an accurate measure of the value of the Condominium as a whole, and that the Association therefore contracted to sell their property for a wholly inadequate price.
 

 The Association then distributed to the minority owners their portion of the sales proceeds according to the Allocation Appraisal values. Plaintiffs contend, however, that in addition to failing to secure a second appraisal of the fair market value of the Condominium as a whole, Links Raleigh had only selected a sample of its units for inclusion in the Allocation Appraisal. Plaintiffs allege that the units selected "were not occupied by tenants; had been prepared for re-leasing, and, therefore, were, in a general sense, in better condition tha[n] other units owned by Links Raleigh having the same or similar size." According to plaintiffs, the biased selection of Links Raleigh units for appraisal skewed the distribution of the ultimate sales proceeds-which plaintiffs maintain was already inadequate-by "inflat[ing] the value of the units owned by Links Raleigh, and therefore, increas[ing] the pro rata share of the purchase price of the entire Condominium allocable to Links Raleigh."
 

 Plaintiffs filed suit against defendants on 5 June 2017 for (1) failing to obtain a fair market value appraisal and instead selling the Condominium for the amount reflected in the Allocation Appraisals-which plaintiffs maintain was an insufficient price and well below the Condominium's fair market value; and (2) manipulating the Links Raleigh Appraisal in order to reduce the amount of the sales proceeds distributed to plaintiffs. Plaintiffs asserted two counts of breach of fiduciary duty against the Association and two counts of unfair trade practices against all defendants. Plaintiffs then filed an amended complaint on 18 August 2017, adding counts of breach of contract and breach of statutory obligations against the Association. Though stated as an independent claim, plaintiffs also sought to pierce the corporate veil of the Association as an additional remedy on the claims for breach of contract, breach of statutory obligations, and breach of fiduciary duties.
 

 On 7 September 2017, the Association and its directors Khomassi, Kane, and Cathcart filed a motion to dismiss plaintiffs' complaint pursuant to Rules 12(b)(1) and (6) of the North Carolina Rules of Civil Procedure. FCP Fund, along with Carr, Links Raleigh, and Greens at Tryon, filed a motion to dismiss pursuant to Rules 12(b)(1), (2) and (6) on 20 September 2017.
 

 *447
 

 *137
 
 On 14 November 2017, the trial court entered an order granting both motions to dismiss plaintiffs' complaint entirely. The trial court's order does not contain findings of fact or conclusions of law, nor does it indicate the specific grounds upon which its dismissal was based. The order instead provides only that "having reviewed and considered the pleadings, the applicable statutes, case law, and other materials, and having heard oral arguments of counsel for all parties, the Court GRANTS Defendants' Motions to Dismiss and hereby dismisses all of Plaintiffs' claims with prejudice." Plaintiffs filed notice of appeal on 29 November 2017.
 

 Standard of Review
 

 "In reviewing a trial court's Rule 12(b)(6) dismissal, the appellate court must inquire whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory."
 
 Newberne v. Dep't of Crime Control & Pub. Safety
 
 ,
 
 359 N.C. 782
 
 , 784,
 
 618 S.E.2d 201
 
 , 203 (2005) (citation and quotation marks omitted).
 

 Dismissal is proper ... when one of the following three conditions is satisfied: (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.
 

 Id.
 
 at 784,
 
 618 S.E.2d at 204
 
 (citations and quotation marks omitted). Otherwise, it is error for a trial court to grant a defendant's motion to dismiss "if the complaint, liberally construed, shows no insurmountable bar to recovery."
 
 Jenkins v. Wheeler
 
 ,
 
 69 N.C. App. 140
 
 , 142,
 
 316 S.E.2d 354
 
 , 356,
 
 disc. review denied
 
 ,
 
 311 N.C. 758
 
 ,
 
 321 S.E.2d 136
 
 (1984). "The effect of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint by presenting the question of whether the complaint's allegations are sufficient to state a claim upon which relief can be granted under
 
 any
 
 recognized legal theory."
 
 Woolard v. Davenport
 
 ,
 
 166 N.C. App. 129
 
 , 133,
 
 601 S.E.2d 319
 
 , 322 (2004) (emphasis added) (citation omitted). Thus, when a defendant files a motion to dismiss, the issue for the court "is not whether [the] plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claim."
 
 Brown v. Lumbermens Mut. Casualty Co.
 
 ,
 
 90 N.C. App. 464
 
 , 471,
 
 369 S.E.2d 367
 
 , 371 (1988),
 
 aff'd in part and rev'd in part
 
 ,
 
 326 N.C. 387
 
 ,
 
 390 S.E.2d 150
 
 (1990).
 

 "The standard of review to be applied by a trial court in deciding a motion under Rule 12(b)(2) depends upon the procedural context
 
 *138
 
 confronting the court."
 
 Parker v. Town of Erwin
 
 ,
 
 243 N.C. App. 84
 
 , 95,
 
 776 S.E.2d 710
 
 , 720 (2015). When the defendant "makes a motion to dismiss without submitting any opposing evidence,"
 
 id
 
 . at 96,
 
 776 S.E.2d at 720
 
 , then "the allegations of the [plaintiff's] complaint must disclose jurisdiction although the particulars of jurisdiction need not be alleged."
 
 Id
 
 . at 96,
 
 776 S.E.2d at 721
 
 . "The trial judge must decide whether the complaint contains allegations that, if taken as true, set forth a sufficient basis for the court's exercise of personal jurisdiction."
 

 Id.
 

 Discussion
 

 Plaintiffs do not dispute that Links Raleigh-of which FCP Fund was the sole member-had the authority to terminate the Condominium upon obtaining an 80% ownership interest therein, or that the Association-of which FCP employees elected themselves the sole directors-was thereafter empowered to sell the entire Condominium to Greens at Tryon-of which FCP Fund was the sole member. Rather, the thrust of plaintiffs' complaint is that defendants illicitly orchestrated the minority owners' forced relinquishment of their property for a price below market value so that FCP Fund could purchase those units at a below-market rate. Moreover, plaintiffs allege that the purposeful selection bias in the Links Raleigh Appraisal further diminished plaintiffs' respective shares of the already inadequate sales price.
 

 In their complaint, plaintiffs assert that the Association's actions in effectuating the sale and distributing the proceeds constituted a breach of its contractual obligations under the Termination Agreement (Count One), a breach of its statutory obligations
 
 *448
 
 under the Condominium Act (Count Two), and a breach of its fiduciary duties owed to plaintiffs (Counts Three and Four). Further, plaintiffs seek to pierce the corporate veil of the Association (Count Five) as to the above Counts in order to also recover from defendants FCP Fund, Carr, Links Raleigh, Greens at Tryon, Khomassi, Cathcart, and Kane. Lastly, plaintiffs allege that all defendants committed an unfair trade practice in violation of
 
 N.C. Gen. Stat. § 75-1.1
 
 (Counts Six and Seven).
 

 I. Count One: Breach of Termination Agreement Against the Association
 

 We first address the legal sufficiency of Count One of plaintiffs' complaint for breach of contractual obligations under the Termination Agreement against the Association.
 

 "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract."
 
 Poor v. Hill
 
 ,
 
 138 N.C. App. 19
 
 , 26,
 
 530 S.E.2d 838
 
 , 843 (2000) (citation omitted).
 

 *139
 
 Thus, in any breach of contract action, "the complaint must allege the existence of a contract between [the] plaintiff and [the] defendant, the specific provisions breached, the facts constituting the breach, and the amount of damages resulting to [the] plaintiff from such breach."
 
 RGK, Inc. v. U.S. Fid. & Guar. Co.
 
 ,
 
 292 N.C. 668
 
 , 675,
 
 235 S.E.2d 234
 
 , 238 (1977) (citation, quotation marks, and emphasis omitted).
 

 In order for a valid contract to exist between two parties,
 

 an offer and acceptance are essential elements; they constitute the agreement of the parties. The offer must be communicated, must be complete, and must be accepted in its exact terms. Mutuality of agreement is indispensable; the parties must assent to the same thing in the same sense,
 
 idem re et sensu
 
 , and their minds must meet as to all the terms.
 

 Yeager v. Dobbins
 
 ,
 
 252 N.C. 824
 
 , 828,
 
 114 S.E.2d 820
 
 , 823-24 (1960) (citations and quotation marks omitted). Additionally, as a matter of law, a non-party to a contract "cannot be held liable for any breach that may have occurred."
 
 Canady v. Mann
 
 ,
 
 107 N.C. App. 252
 
 , 259,
 
 419 S.E.2d 597
 
 , 601 (1992),
 
 disc. review improvidently allowed
 
 ,
 
 333 N.C. 569
 
 ,
 
 429 S.E.2d 348
 
 (1993).
 

 In the instant case, the substance of plaintiffs' breach of contract claim is that the Association breached the provisions of the Termination Agreement when it neglected to secure an independent appraisal of the fair market value of the Condominium as a whole and instead used the sum of the Allocation Appraisal values to determine the purchase price for the Condominium.
 

 Pertaining to the element of breach, plaintiffs' complaint contains the following allegations:
 

 69. ... Section 2 of the Termination Agreement provided:
 

 The Association shall offer to sell the Property for a price of not less than $26,000,000.00 Twenty-Six Million Dollars, or for the Appraised Value (as that value is determined by the method set forth in Section 6), whichever is greater, and may contract for sale of the Property to any qualified purchaser, on commercially reasonable terms, for any amount in excess of $26,000,000.00 (Twenty-Six Million Dollars).
 

 *140
 
 70. Section 5 of the Termination Agreement provided for an appraisal to permit the allocation of the net proceeds among the various unit owners, [and] in particular, provid[ed]:
 

 ... The appraisal of the fair market value of the units, limited common elements, and common element interests, immediately before termination,
 
 shall be used only for purposes of distribution of the net proceeds of the sale of the Property.
 

 71. Section 6 of the Termination Agreement provided for the appraisal to be used as part of establishing the sale price for the entire condominium, providing:
 

 The Association shall contract with one or more independent appraisers ... to determine the fair market value of the Property as a whole....
 

 ....
 

 73. Although ... the specific language of Section 5 of the Termination Agreement[ ]
 

 *449
 
 provide[s] that the Allocation Appraisal
 
 shall be used only for purposes of distribution of the net proceeds of the sale of the Property
 
 , the Association used the sum of the Allocation Appraisal values as the amount to be paid by Greens at Tryon for the entire Condominium.
 

 74. Use of the Allocation Appraisal values as the purchase price (and the amount to be allocated to each unit) is in violation of the specific provisions of Section 5 of the Termination Agreement.
 

 75. The Association did not have an independent appraiser determine the fair market value of the Condominium as a whole, as required by Section 6 of the Termination Agreement.
 

 76. Because the Association did not have an independent appraiser determine the fair market value of the Condominium as a whole, its sale of the entire Condominium, for the sum of the Allocation Appraisal values, violated the requirements of Section 2 of the Termination Agreement.
 

 *141
 
 Defendants, on the other hand, construe Section 2 of the Termination Agreement as simply providing that the Condominium was to be sold "for any amount in excess of $26,000,000.00[.]" Because the Association ultimately sold the Condominium for $27,080,000.00, defendants maintain that there was no breach of the Termination Agreement and that the trial court therefore properly dismissed Count One of plaintiffs' complaint. However, Section 6 of the Termination Agreement required the Association to obtain an appraisal of the fair market value of the Condominium as a whole, and Section 5 provided that the Allocation Appraisal was to be used "only for purposes of distribution of the net proceeds of the sale of the" Condominium. Thus, when construed as true, plaintiffs' allegations are adequate to allege a breach of the Termination Agreement, notwithstanding defendants' references to the latter clause contained in Section 2.
 
 See
 

 Woolard
 
 ,
 
 166 N.C. App. at 134
 
 ,
 
 601 S.E.2d at 323
 
 .
 

 More fundamentally, however, defendants argue that the trial court properly dismissed plaintiffs' claim for breach of contract because "neither [plaintiffs] nor the Association executed the Termination Agreement" or were parties thereto. Nevertheless, plaintiffs maintain that dismissal was improper because the Termination Agreement is "by its form and style a contract" that is binding upon the Association, and that plaintiffs have standing to enforce its provisions against the Association because they were the intended third-party beneficiaries thereof.
 

 We agree with defendants that, despite having adequately alleged a breach of the terms of the Termination Agreement, the trial court properly dismissed plaintiffs' claim for breach of contract against the Association. Absent from the complaint are allegations setting forth the other necessary element of plaintiffs' breach of contract claim-that is, that the Termination Agreement constituted a binding contract to which the
 
 Association
 
 was in fact a party. The Termination Agreement explicitly states that it was "made ... by Links Raleigh" only. The Association did not execute the Termination Agreement, nor is the Association named as a party thereto. The particular breaches for which plaintiffs' complaint seeks to hold the Association liable are preceded by a declaration that only "Links Raleigh, being the owners of more than eighty (80) percent of the condominium units within the Links Club Condominiums ... hereby agrees as follows[.]"
 
 [1]
 

 *142
 
 In seeking to hold the Association liable as a party to the Termination Agreement, plaintiffs' complaint only contains the following allegations:
 

 63. On May 17, 2017, Links Raleigh, as the owner of more than eighty (80) percent of the units within the Condominium, executed [the Termination Agreement]....
 

 ....
 

 *450
 
 77. ... [T]he Association breached its contractual and other obligations by failing to comply with the specific requirements of the Termination Agreement.
 

 Beyond the conclusory statement in paragraph 77 that the Association had "contractual and other obligations" under the Termination Agreement, plaintiffs' complaint is devoid of allegations that the Association was a party to, or otherwise bound by, the Termination Agreement, thereby rendering the Association liable for a breach of its terms.
 

 Nevertheless, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that [the] plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim."
 
 Snyder v. Freeman
 
 ,
 
 300 N.C. 204
 
 , 209,
 
 266 S.E.2d 593
 
 , 597 (1980) (citation, quotation marks, and emphasis omitted). Thus, in the instant case, the question is not whether plaintiffs have affirmatively alleged the Association to be a party to the Termination Agreement, but whether the complaint alleges facts which, if true, would be sufficient to establish the same.
 
 See
 
 id.
 

 ("The question is, then, whether under any set of facts which [the] plaintiff may be able to prove relevant to the agreement on which she relies, there is some legal theory available by which she can establish liability against [the] defendants....").
 

 In the instant case, while the complaint and attached documents reveal that the Termination Agreement does not name the Association as a party and that the Association did not otherwise manifest an assent to its terms via signature, we note that the facts alleged in plaintiffs' complaint do permit the possibility that the Association had nonetheless manifested an assent to the Termination Agreement by virtue of beginning performance thereunder.
 
 See, e.g.
 
 ,
 
 id.
 
 at 218,
 
 266 S.E.2d at 602
 
 ("Acceptance by conduct is a valid acceptance." (citations omitted) );
 
 Burden Pallet Co. v. Ryder Truck Rental, Inc.
 
 ,
 
 49 N.C. App. 286
 
 , 289,
 
 271 S.E.2d 96
 
 , 97 (1980) ("The object of a signature to a contract is to show assent, but the signing of a written contract is not necessarily essential to its validity. Assent may be shown in other ways, such as acts or conduct...." (citations omitted) ),
 
 disc. review denied
 
 ,
 
 *143
 

 301 N.C. 722
 
 ,
 
 276 S.E.2d 282
 
 (1981). Here, plaintiffs' complaint contains allegations that the Association performed in accordance with the provisions of the Termination Agreement. In particular, the Association secured the Allocation Appraisal, effectuated the Condominium's sale, and held title to the units as trustee for all of the unit owners, all of which the Association was compelled to do pursuant to the terms of the Termination Agreement.
 

 The Association's performance, however, was limited to those acts which it was statutorily required to discharge pursuant to the Condominium Act.
 
 See, e.g.
 
 , N.C. Gen. Stat. § 47C-2-118(e) (providing,
 
 inter alia
 
 , that "[t]he association, on behalf of the unit owners, may contract for the sale of real estate in the condominium"; "[i]f any real estate in the condominium is to be sold following termination, title to that real estate, upon termination, vests in the association as trustee for the holders of all interests in the units"; and "[p]roceeds of the sale must be distributed to unit owners and lienholders as their interests may appear [pursuant to the Allocation Appraisal] as provided in subsection (h)").
 

 Plaintiffs' complaint is devoid of facts establishing that the Association performed any act specifically in furtherance of the Termination Agreement above and beyond that which it was required to do by statute. In fact, the only provisions of the Termination Agreement beyond the purview of the Condominium Act are those provisions which plaintiffs allege the Association to have breached. Thus, the allegations reveal that the Association's conduct in the instant case represented an abidance by the statutory obligations under the Condominium Act, rather than indicating an assent to be independently bound by the Termination Agreement.
 

 We are unable to divine any additional theories, and plaintiffs have proffered none, that would otherwise establish that the Association had assented to be bound by the terms of the Termination Agreement above and beyond the scope of its statutory duties under N.C. Gen. Stat. § 47C-2-118. Accordingly,
 
 *451
 
 even when taken as true, we conclude that the allegations in plaintiffs' complaint are insufficient to establish that the Termination Agreement constituted a valid contract between the Association and Links Raleigh.
 

 Because we conclude that plaintiffs' complaint fails to establish that the Termination Agreement was a valid contract binding on the Association, the trial court did not err in granting defendants' motions to dismiss this claim. Moreover, we need not address the issue of whether plaintiffs had standing to sue for breach of the Termination Agreement as the alleged intended third-party beneficiaries thereof.
 

 *144
 

 II. Count Two: Breach of Statutory Obligations Against the Association
 

 In Count Two of their amended complaint, plaintiffs allege that "[t]he Association is statutorily obligated, pursuant to the provisions of N.C.G.S. § 47C-2-118, to comply with the provisions of the Termination Agreement; and to comply with the provisions of that statute, and by failing to so comply, violated N.C.G.S. § 47C-2-118." Further, while N.C. Gen. Stat. § 47C-2-118 does not provide for a private right of action that would allow plaintiffs to assert a breach of statutory obligations claim against the Association, plaintiffs contend that "[t]he language, structure and context of the act imply that unit owners have a private right of action for violation of the act."
 

 We need not determine whether N.C. Gen. Stat. § 47C-2-118 implies a private right of action. Even assuming that it does, the allegations in plaintiffs' complaint do not support their claim for breach of statutory obligations.
 

 First, plaintiffs do not identify any particular provision of N.C. Gen. Stat. § 47C-2-118 that the Association has violated. The only indication of a specific statutory violation is found in paragraph 73 of the complaint, which alleges that "[a]lthough the
 
 structure
 
 of the Condominium Act ... provide[s] that the Allocation Appraisal
 
 shall be used only for purposes of distribution of the net proceeds of the sale of the Property
 
 , the Association used the sum of the Allocation Appraisal values as the amount to be paid ... for the entire Condominium." (First emphasis added). However, the text of N.C. Gen. Stat. § 47C-2-118 does not delineate any particular method by which a condominium's sale price must be determined.
 
 See
 

 Correll v. Div. of Soc. Servs.
 
 ,
 
 332 N.C. 141
 
 , 144,
 
 418 S.E.2d 232
 
 , 235 (1992) ("Statutory interpretation properly begins with an examination of the plain words of the statute." (citation omitted) ).
 

 Moreover, notwithstanding the admittedly logical "structure" proposed by plaintiffs, the only provision contained in N.C. Gen. Stat. § 47C-2-118 that addresses the use of an appraisal is Subsection (h), which merely requires that an appraisal be obtained of the "fair market value of [the owners'] units, limited common elements, and common elements interests" for the sole purpose of establishing how the sale proceeds are to be allocated among unit owners. N.C. Gen. Stat. § 47C-2-118(h)(1). The General Assembly's explicit inclusion of a requirement that a particular appraisal be obtained in order to determine the appropriate allocation of proceeds suggests that its exclusion of any prescribed mechanism for establishing a condominium's ultimate sale price was intentional.
 
 See
 

 *145
 

 Mangum v. Raleigh Bd. of Adjustment
 
 ,
 
 196 N.C. App. 249
 
 , 255,
 
 674 S.E.2d 742
 
 , 747 (2009) ("One of the long-standing rules of interpretation and construction in this state is
 
 expressio unius est exclusio alterius
 
 , the expression of one thing is the exclusion of another." (citations omitted) ). Indeed, N.C. Gen. Stat. § 47C-2-118 explicitly provides that "the association has all powers necessary and appropriate to effect the sale." N.C. Gen. Stat. § 47C-2-118(e). Absent a specific statutory provision limiting those powers, there is no support for plaintiffs' contention that the Association violated its obligations under N.C. Gen. Stat. § 47C-2-118 when it failed to obtain a separate appraisal and instead used the Allocation Appraisal as the basis for the Condominium's sale price.
 
 Cf.
 

 Correll
 
 ,
 
 332 N.C. at 145
 
 ,
 
 418 S.E.2d at 235
 
 ("If our General Assembly had intended to require that applicants own their primary places of residence before receiving the advantage of the contiguous property exclusion
 
 *452
 
 contained in N.C.G.S. § 108A-55, we must assume that it would have included plain language to that effect in the other plain language of the statute." (citation omitted) ).
 

 Next, plaintiffs attempt to circumvent the absence of a statutory requirement governing the sale price of a condominium terminated under the Act by arguing that N.C. Gen. Stat. § 47C-2-118 nevertheless required the Association "to comply with the provisions of the Termination Agreement[,]" which
 
 did
 
 contain such a requirement. Thus, because the Association did not sell the Condominium in a manner consonant with the procedures provided in the Termination Agreement, plaintiffs maintain that it was error for the trial court to dismiss Count Two of their complaint for breach of statutory obligations. However, this contention is likewise unsupported by law.
 

 Again, plaintiffs do not identify the provision of N.C. Gen. Stat. § 47C-2-118 that they allege requires a condominium association to abide by the terms of a termination agreement. Subsection (b) addresses execution of a termination agreement, but provides only that "[a]n agreement to terminate must be evidenced by the execution of a termination agreement ...
 
 by the requisite number of unit owners
 
 ." N.C. Gen. Stat. § 47C-2-118(b) (emphasis added). Subsection (c) does provide that "[i]f, pursuant to the agreement, any real estate in the condominium is to be sold following termination, the termination agreement must set forth the minimum terms of the sale." N.C. Gen. Stat. § 47C-2-118(c). However, when read in conjunction with the requirements of Subsection (b) that (1) "[a] termination agreement and all ratifications thereof must be recorded ... and is effective only upon recordation[,]" and (2) a termination agreement "must specify a date after which the agreement will be void unless recorded before that date[,]" it appears that the purpose
 
 *146
 
 of setting forth the minimum terms of the sale under Subsection (c) is not to hold a condominium association liable with respect thereto, but instead to provide the public with adequate notice of the transaction.
 
 Cf.
 

 Hill v. Pinelawn Mem'l Park, Inc.
 
 ,
 
 304 N.C. 159
 
 , 163,
 
 282 S.E.2d 779
 
 , 782 (1981) ("The purpose of [our recording] statute is to enable intending purchasers and encumbrancers to rely with safety on the public record concerning the status of land titles." (citations omitted) ). Quite plainly, N.C. Gen. Stat. § 47C-2-118 imposes no explicit statutory duty upon a condominium association to abide by the provisions that the requisite number of unit owners have specified in a termination agreement. This Court cannot require otherwise, however provident doing so might be.
 
 Fagundes v. Ammons Dev. Grp., Inc.
 
 , --- N.C. App. ----, ----,
 
 796 S.E.2d 529
 
 , 533 ("We lack the authority to change the law on the ground that it might make good policy sense to do so."),
 
 disc. review denied
 
 ,
 
 370 N.C. 66
 
 ,
 
 803 S.E.2d 626
 
 (2017).
 

 Accordingly, we conclude that the trial court did not err by dismissing Count Two of plaintiffs' complaint for breach of statutory obligations against the Association, in that the allegations of plaintiffs' complaint are insufficient to state a claim upon which relief can be granted.
 

 III. Counts Six and Seven: Unfair Trade Practices Against All Defendants
 

 We next address plaintiffs' argument that the trial court erred in dismissing Counts Six and Seven of the amended complaint for unfair trade practices in violation of
 
 N.C. Gen. Stat. § 75-1.1
 
 . Defendants contend that the trial court properly dismissed plaintiffs' unfair trade practices claims against all defendants because the allegations in plaintiffs' complaint "do not relate to business activities that were in or affecting commerce." We agree.
 

 "The elements of a claim for unfair and deceptive practices in violation of G.S. § 75-1.1 are: (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff...."
 
 Furr v. Fonville Morisey Realty, Inc.
 
 ,
 
 130 N.C. App. 541
 
 , 551,
 
 503 S.E.2d 401
 
 , 408 (1998) (citation and quotation marks omitted),
 
 disc. review improvidently allowed
 
 ,
 
 351 N.C. 41
 
 ,
 
 519 S.E.2d 314
 
 (1999). In analyzing the second element of "in or affecting commerce," our Supreme Court has explained that "our General Assembly sought
 
 *453
 
 to prohibit unfair or deceptive conduct in interactions between different market participants. The General Assembly did not intend for the Act to regulate purely internal business operations[,]" or "to intrude into the internal operations of a single market participant."
 
 *147
 

 White v. Thompson
 
 ,
 
 364 N.C. 47
 
 , 47-48, 53,
 
 691 S.E.2d 676
 
 , 676, 680 (2010). Accordingly, "any unfair or deceptive conduct contained solely within a single [market participant] is not covered by the Act."
 
 Id.
 
 at 53,
 
 691 S.E.2d at 680
 
 .
 

 In the instant case, the alleged unfair and deceptive conduct on the part of defendants all occurred within the Condominium Association of which plaintiffs were members. While plaintiffs maintain that defendants' acts went "well beyond the internal operations of the Association" and "involve[d] interactions with and affecting the public," they do not identify any particular member of the public-beyond the members of the Association itself-affected by defendants' conduct. Rather, each of the acts of which plaintiffs complain involved the "internal conduct of individuals within a single market participant"-that is, the Association.
 
 Id
 
 .
 

 Because defendants "unfairly and deceptively interacted only with" fellow members of the Condominium Association, plaintiffs cannot establish that defendants' actions were "in or affecting commerce."
 
 Id.
 
 at 54,
 
 691 S.E.2d at 680
 
 . Accordingly, the allegations contained in Counts Six and Seven of plaintiffs' amended complaint fall outside of the scope of
 
 N.C. Gen. Stat. § 75-1.1
 
 , and the trial court therefore properly granted defendants' motions to dismiss those claims.
 

 IV. Counts Three and Four: Breach of Fiduciary Duty Against the Association
 

 Finally, after establishing that the law does not support plaintiffs' claims for breach of contract, breach of statutory obligations, and unfair trade practices, we nevertheless agree with plaintiffs that they have stated a claim for breach of fiduciary duty against the Association.
 

 a. Fiduciary Relationship
 

 It is axiomatic that "[f]or a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties."
 
 Dalton v. Camp
 
 ,
 
 353 N.C. 647
 
 , 651,
 
 548 S.E.2d 704
 
 , 707 (2001) (citations omitted).
 

 [T]here are two types of fiduciary relationships: (1) those that arise from legal relations such as attorney and client, broker and client ..., partners, principal and agent, trustee and cestui que trust, and (2) those that exist as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other.
 

 S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC
 
 ,
 
 189 N.C. App. 601
 
 , 613,
 
 659 S.E.2d 442
 
 , 451 (2008) (citation and internal quotation marks
 
 *148
 
 omitted). For example, it is well established "that the trustee of a trust has a fiduciary obligation to the beneficiary of the trust."
 
 Melvin v. Home Fed. Savings & Loan Ass'n
 
 ,
 
 125 N.C. App. 660
 
 , 664,
 
 482 S.E.2d 6
 
 , 8,
 
 disc. review denied
 
 ,
 
 346 N.C. 281
 
 ,
 
 487 S.E.2d 551
 
 (1997).
 

 By asserting that a fiduciary relationship existed between plaintiffs and the Association, plaintiffs have not, as defendants contend, attempted to hold the Association liable pursuant to N.C. Gen. Stat. § 55A-8-30 (2017), which defendants note "vests the fiduciary duty obligations of a nonprofit corporation like the Association in its Board of Directors." Rather, Counts Three and Four of plaintiffs' complaint explicitly reference N.C. Gen. Stat. § 47C-2-118, and implicitly reference Subsection (e), by alleging that "[t]he Association, by virtue of its position as Trustee for all of the unit owners, owed a fiduciary duty, to each and every one of the unit owners" in effectuating the Condominium's sale.
 

 Indeed, N.C. Gen. Stat. § 47C-2-118(e) explicitly provides that when a condominium is terminated pursuant thereto and is thereafter to be sold, title to all of the units "vests in
 
 the association
 
 as
 
 trustee
 
 for the holders of all interests in the units." N.C. Gen. Stat. § 47C-2-118(e) (emphasis added). Moreover, an association's independent status as a fiduciary is further evidenced by N.C. Gen. Stat. § 47C-3-119 -quite aptly titled "Association as Trustee"-which provides that "[w]ith respect to a third person dealing with the
 
 *454
 
 association in the association's capacity as a trustee under G.S. 47C-2-118 following termination ..., the existence of trust powers and their proper exercise by the association may be assumed without inquiry." N.C. Gen. Stat. § 47C-3-119 (2017). The Condominium Act thus makes clear that an association will separately and independently owe certain fiduciary duties as trustee in the sale of a condominium pursuant to N.C. Gen. Stat. § 47C-2-118. This statutorily imposed fiduciary relationship is the basis of plaintiff's complaint.
 
 [2]
 
 Accordingly, plaintiffs have adequately alleged the existence of a fiduciary relationship between themselves and the Association so as to survive dismissal.
 
 *149
 

 b. Breach
 

 Having determined that plaintiffs sufficiently pleaded a fiduciary relationship, we next examine whether plaintiffs have adequately alleged facts necessary to establish a breach of the Association's duties associated therewith.
 

 As our Supreme Court has stated, "one of the most fundamental duties of [a] trustee throughout [a] trust relationship is to maintain complete loyalty to the interests of his [beneficiaries]."
 
 Wachovia Bank & Trust Co. v. Johnston
 
 ,
 
 269 N.C. 701
 
 , 711,
 
 153 S.E.2d 449
 
 , 457 (1967). Trustees may "never paramount their personal interest over the interest of those for whom they have assumed to act."
 
 Miller v. McLean
 
 ,
 
 252 N.C. 171
 
 , 174,
 
 113 S.E.2d 359
 
 , 362 (1960) (citations omitted). For instance, "[i]t is a well established principle, that a trustee cannot buy at his own sale. He cannot be vendor and vendee at the same time of trust property[.]"
 
 Wachovia Bank & Trust Co.
 
 ,
 
 269 N.C. at 713
 
 ,
 
 153 S.E.2d at 458
 
 (citation and quotation marks omitted). The North Carolina Uniform Trust Code also illustrates that a trustee's sale of trust property is "rebuttably presumed to be affected by a conflict of interest if the trustee enters into the transaction with[,]"
 
 inter alia
 
 , an "officer, director, member, manager, or partner of the trustee, or an entity that controls, is controlled by, or is under common control with the trustee;" or "[a]ny other person or entity in which the trustee, or a person that owns a significant interest in the trust, has an interest or relationship that might affect the trustee's best judgment." N.C. Gen. Stat. § 36C-8-802(c)(3)&(4) (2017).
 

 The reasons for the loyalty rule are evident. A man cannot serve two masters.
 
 He cannot fairly act for his interest and the interest of others in the same transaction.
 
 Consciously or unconsciously, he will favor one side or the other, and where placed in this position of temptation, there is always the danger that he will yield to the call of self-interest.
 

 Wachovia Bank & Trust Co.
 
 ,
 
 269 N.C. at 715
 
 ,
 
 153 S.E.2d at 459-60
 
 (emphasis added).
 

 There are, however, "rare and justifiable exceptions" when a self-interested transaction might not run afoul of a trustee's fiduciary duties, including where it is found that "(1) complete disclosure of all facts was made by the trustee, (2) the sale ... materially promote[d] the best interests of the trust and its beneficiaries, and (3) there [were] no other purchasers willing to pay the same or a greater price[.]"
 
 Id.
 
 at 715,
 
 153 S.E.2d at 460
 
 . In other words, where a trustee is alleged to have made a
 
 *150
 
 self-interested transaction involving property held in trust in breach of its fiduciary duties, the trustee must be able to demonstrate that it nevertheless "affirmatively put forth real and good faith endeavors to find the most advantageous purchaser and that there [were] no other available purchasers willing to pay the same price[.]"
 
 Id.
 
 at 716,
 
 153 S.E.2d at 460
 
 . "This precaution must be taken, not because there is fraud[,]"
 

 id.
 

 , but because "[t]he trustee, because of his fiduciary relationship, is skating on the thin
 
 *455
 
 and slippery ice of presumed fraud, which he must rebut by proof that no fraud was committed and no undue influence ... exerted[,]"
 
 id.
 
 at 715,
 
 153 S.E.2d at 460
 
 .
 

 In the instant case, plaintiffs alleged in their complaint that "[t]he Association breached its fiduciary duty to Plaintiffs by arranging for, approving, and proceeding with the forced sale of the entire Condominium to FCP Fund (through its subsidiary, Greens at Tryon), for an inadequate price[,]" and "by failing to have an independent appraiser generate the Allocation Appraisal, ensure that the appraisal used was without bias, and distribute it within the time frame specified by N.C.G.S. Section 47C-2-118." Plaintiffs additionally set forth various particular allegations, including the following:
 

 80. [T]he Links Raleigh Appraisal was deficient in that Williams Appraisers, Inc. only looked at a subset of the units owned by Links Raleigh, with those units having been selected by Links Raleigh. On information and belief, the units made available ... for inspection were not occupied by tenants; had been prepared for re-leasing, and, therefore, were, in a general sense, in better condition tha[n] other units owned by Links Raleigh having the same or similar size. This selection bias creates a persistent appraisal bias which inflates the value of the units owned by Links Raleigh, and therefore, increased the pro rata share of the purchase price of the entire Condominium allocable to Links Raleigh....
 

 ....
 

 88. The Association could and should have attempted to fulfill its duty to each and every one of the unit owners by listing and exposing the Condominium for sale; by offering the same to potential third party apartment complex owners for a price no less than that determined by an independent third party appraisal, or by otherwise acting in a way
 
 *151
 
 consistent with attempting to maximize the sales price for the benefit of all unit owners.
 

 ....
 

 90. On information and belief, [the Association's Board Members] Khomassi; Cathcart and Kane each also had a financial interest in completing the transaction resulting in the sale of the entire Condominium to Greens at Tryon; and the Association was similarly prioritizing their interests by proceeding with the sale to Greens at Tryon.
 

 ....
 

 99. Although N.C.G.S. Section 47C-2-118 provides that the Allocation Appraisal shall be distributed to the unit owners, who shall then have thirty (30) days to object to the same; Links Raleigh distributed the Other Owners Appraisal on May 2, 2017, and the Association proceeded with the closing on May 31, 2017; not allowing the unit owners thirty (30) days to object.
 

 100. The Association did not distribute the Links Raleigh Appraisal to the Other Owners, although it apparently used the same (with the Other Owners Appraisal) as the Allocation Appraisal.
 

 We conclude that these allegations are more than sufficient to withstand defendants' motions to dismiss plaintiffs' breach of fiduciary duty claims against the Association. The trial court thus erred when it dismissed Counts Three and Four of plaintiffs' complaint for breach of fiduciary duty against the Association.
 

 c. Veil Piercing
 

 Likewise, the amended complaint alleges appropriate facts and circumstances sufficient to withstand dismissal of veil piercing as a potential remedy on plaintiffs' breach of fiduciary duty claims.
 
 [3]
 

 "Piercing the corporate veil ... allows a plaintiff to impose legal liability for a corporation's obligations ... upon some other company or individual that controls and dominates the corporation."
 
 Green
 
 , 367 N.C. at 145, 749 S.E.2d at 270 (citation omitted). "It is well recognized that
 
 *152
 
 courts will disregard the corporate form or 'pierce the corporate veil,' and extend liability for corporate
 
 *456
 
 obligations beyond the confines of a corporation's separate entity, whenever necessary to prevent fraud or to achieve equity."
 
 Glenn v. Wagner
 
 ,
 
 313 N.C. 450
 
 , 454,
 
 329 S.E.2d 326
 
 , 330 (1985) (citation omitted).
 

 The Supreme Court has explained that "[e]vidence upon which [our courts] have relied to justify piercing the corporate veil includes inadequate capitalization, noncompliance with corporate formalities, lack of a separate corporate identity, excessive fragmentation, siphoning of funds by the dominant shareholder, nonfunctioning officers and directors, and absence of corporate records."
 
 Green
 
 , 367 N.C. at 145, 749 S.E.2d at 270 (citation omitted). Ultimately, "[t]he aggrieved party must show that the corporation is so operated that it is a mere instrumentality or
 
 alter ego
 
 of the sole or dominant shareholder and a shield for his activities in violation of the declared public policy or statute of the State."
 
 Id.
 
 (citation and quotation marks omitted).
 

 The circumstances pleaded in plaintiffs' complaint demonstrate that the instant case is one in which it would be appropriate to pierce the corporate veil, and the allegations are sufficient to survive defendants' motions to dismiss. Plaintiffs alleged that the Association was entirely dominated by FCP Fund, through its subsidiary Links Raleigh. The Association's Board was fully composed of FCP personnel Khomassi, Cathcart, and Kane. Moreover, it appears that the Association is wholly
 
 un
 
 capitalized, in that the Termination Agreement provided for dissolution of the Association upon sale of the Condominium and distribution of the net proceeds, according to statute. A judgment against the Association would be indexed in the name of the Condominium and the Association; yet, upon termination, all of the Association's assets were presumably distributed amongst the unit owners-over eighty percent of which to defendants-and any preexisting lienholders.
 
 See
 
 N.C. Gen. Stat. §§ 47C-2-118(g), 47C-3-117(d) (2017). It would be inequitable to allow dominant shareholders to shield themselves from liability through use of a corporate entity, the dissolution of which was intended from the outset of their course of action.
 

 Next, because the allegations, if true, are sufficient to allow a fact finder to determine "that the corporate identity should be disregarded" in the present case, "the next inquiry is whether [the] noncorporate defendant[s] may be held liable for [their] personal actions as an officer or director."
 
 Green
 
 , 367 N.C. at 145, 749 S.E.2d at 270. Plaintiffs' complaint must contain allegations sufficient to establish three elements:
 

 *153
 
 (1) Control, not mere majority or complete stock control,
 
 but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked
 
 so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
 

 (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and
 
 unjust act in contravention of a plaintiff's legal rights
 
 ; and
 

 (3) The aforesaid control and breach of duty must
 
 proximately cause the injury or unjust loss
 
 complained of.
 

 Id.
 
 at 145-46, 749 S.E.2d at 270 (emphases added) (citation, quotation marks, and alteration omitted).
 

 Plaintiffs' complaint contains the following allegations relevant to piercing the corporate veil of the Association in order to hold defendants FCP Fund, Carr, Links Raleigh, Greens at Tryon, Khomassi, Cathcart, and Kane personally liable for the Association's alleged breaches of fiduciary duty:
 

 22. On information and belief, Defendant Thomas A. Carr ... is an Authorized Trustee for FCP Fund.... On further information and belief, the acts of FCP Fund, complained herein, were at the direction, and under the control of Carr.
 

 ....
 

 25. On information and belief, Defendant Nason Khomassi ... has been, since prior to August 31, 2016, employed by [FCP].... On further information and belief, Khomassi has been, since August 31, 2016, a member of the Board of Directors
 
 *457
 
 of the Association; and the President of the Association.
 

 26. On information and belief, Defendant Alex Cathcart ... has been, since prior to August 31, 2016, employed by [FCP].... On further information and belief, Cathcart has been, since August 31, 2016, a member of the Board of
 
 *154
 
 Directors of the Association; and the Vice-President and Secretary of the Association.
 

 27. On information and belief, Defendant Bryan M. Kane ... has been, since prior to August 31, 2016, Senior Vice-President-Acquisitions for [FCP].... On further information and belief, Kane has been, since August 31, 2016, a member of the Board of Directors of the Association; and the Treasurer of the Association.
 

 28. On information and belief, FCP Fund is the sole member of both Links Raleigh and Greens at Tryon.
 

 ....
 

 38. On July 26, 2016, FCP Fund caused Links Raleigh to be formed by recording Articles of Incorporation with the Delaware Secretary of State.
 

 ....
 

 39. On information and belief, prior to July 26, 2016, FCP Fund had, either directly or through an entity that it controlled, arranged for or contracted with Fairway Apartments to purchase their units in the Condominium.
 

 ....
 

 41. FCP Fund intended to purchase 80 percent of the units in the Condominium through Links Raleigh (or some other entity under its control) so that it could, acting through the unit purchasing entity, terminate the Condominium....
 

 42. FCP Fund intended to terminate the Condominium so that the entire Condominium would be available for purchase; and so that it, acting through Links Raleigh, or some other entity under its control, could purchase the entire Condominium at a below market price[.]
 

 ....
 

 44. FCP Fund and its Trustee intended to ensure that it, acting through Links Raleigh, or another entity under its control, would purchase the entire Condominium, by having Links Raleigh ... use its majority of the voting interests in the condominium to elect a compliant board, who would have the Association contract to sell the entire Condominium to an entity under FCP Fund's control.
 

 *155
 
 45. FCP Fund and its Trustee intended to use its control over the Board of the Association to secure, as a purchase price for an entity under its control, a non-market price for the entire condominium, and terms otherwise favorable to it.
 

 46. On August 31, 2016, Cathcart, in furtherance of FCP Fund's plan, acting as a representative of Links Raleigh, and with proxies provided by Fairway Apartments, conducted a special meeting of the Association, at which time: (a) all of the then current Directors of the Board were removed; (b) the number of authorized Directors was reduced to three (3); and (c) Khomassi[,] Cathcart and Kane were elected as the Directors of the reduced Association Board.
 

 ....
 

 65. On May 31, 2017, the Association, acting on behalf through its Board, Khomassi, Cathcart and Kane, and on behalf of FCP Fund III and the other Defendants, sold the entire Condominium to Greens at Tryon for $27,080,000.00[.]
 

 ....
 

 75. The Association did not have an independent appraiser determine the fair market value of the Condominium as a whole, as required by Section 6 of the Termination Agreement.
 

 ....
 

 111. The Association was operated as a mere instrumentality or alter ego of FCP Fund; Carr; Links Raleigh; Greens at Tryon; Khomassi[,] Cathcart and Kane, who collectively exercised such complete domination and control of the Association that it had no independent will or identity.
 

 112. FCP Fund; Carr; Links Raleigh; Greens at Tryon; Khomassi; Cathcart and Kane used their domination of the Association to perpetuate a series of wrongs, including the forced sale of the units owned
 
 *458
 
 by Plaintiffs, to FCP Fund, through its wholly owned subsidiary Greens at Tryon, for an inadequate price, and in an improper percentage amount, in violation of the Association's fiduciary duties.
 

 *156
 
 Taken as a whole and viewed in the light most favorable to plaintiffs, we conclude that the above allegations, together with those setting forth a breach of fiduciary duty, allege domination and control sufficient to establish a theory of liability upon which to hold defendants FCP Fund, Carr, Links Raleigh, Greens at Tryon, Khomassi, Cathcart, and Kane personally liable for the Association's alleged breaches of fiduciary duty. Plaintiffs are entitled to offer evidence to support the appropriateness of that remedy.
 
 Brown
 
 ,
 
 90 N.C. App. at 471
 
 ,
 
 369 S.E.2d at 371
 
 .
 

 As plaintiffs' complaint demonstrates no insurmountable bar to piercing the corporate veil on Counts Three and Four of plaintiffs' complaint, we conclude that the trial court erred to the extent that it dismissed the same.
 

 d. Personal Jurisdiction
 

 Lastly, defendants FCP Fund, Carr, Links Raleigh, and Greens at Tryon's motion to dismiss also cited Rule 12(b)(2), maintaining that plaintiffs' complaint failed to allege sufficient facts to support the proper exercise of personal jurisdiction over defendant Carr, an out-of-state resident, by a Court of this State. On appeal, defendants argue that "[plaintiffs] failed to establish personal jurisdiction over defendant Thomas Carr and have failed to preserve its appeal of that determination by the trial court." Accordingly, defendants maintain that this Court must "affirm dismissal of the [complaint] against Carr pursuant to Rule 12(b)(2)." However, the trial court's order reveals no such determination, nor does the transcript of the hearing indicate the same.
 

 It is axiomatic that "[a]bsent a request by the parties," the trial court need not include findings of fact or conclusions of law in its order on a motion to dismiss under Rule 12(b)(2).
 
 J.M. Thompson Co. v. Doral Mfg. Co.
 
 ,
 
 72 N.C. App. 419
 
 , 423-24,
 
 324 S.E.2d 909
 
 , 912,
 
 disc. review denied
 
 ,
 
 313 N.C. 602
 
 ,
 
 330 S.E.2d 611
 
 (1985). Here, neither party requested that the trial court include specific findings in its order. The trial court granted defendants' motions to dismiss by entering a general, one-sentence order, thereby tasking this Court with determining whether the trial court's dismissal should be upheld under any of the grounds alleged.
 
 Cf.
 

 Helm v. Appalachian State Univ.
 
 ,
 
 194 N.C. App. 239
 
 , 250,
 
 670 S.E.2d 571
 
 , 578 (2008) (holding that a trial court need not provide "conclusions of law explaining its decision to dismiss [a] plaintiff's complaint" because, under
 
 de novo
 
 review, this Court "disregard[s] any ... conclusions of law drafted by the trial court"),
 
 rev'd on other grounds
 
 ,
 
 363 N.C. 366
 
 ,
 
 677 S.E.2d 454
 
 (2009). Accordingly, because we conclude that dismissal of Counts Three, Four, and Five of plaintiffs' complaint
 
 *157
 
 was improper under Rule 12(b)(6), we next determine whether that dismissal must nevertheless be upheld as to defendant Carr pursuant to Rule 12(b)(2).
 

 A complaint against a non-resident defendant should not be dismissed for lack of personal jurisdiction if the complaint reveals that there exists "certain minimum contacts between the non-resident defendant and the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."
 
 Tom Togs, Inc., v. Ben Elias Indus. Corp.
 
 ,
 
 318 N.C. 361
 
 , 365,
 
 348 S.E.2d 782
 
 , 786 (1986) (citation and quotation marks omitted);
 
 see also
 

 J.M. Thompson Co.
 
 ,
 
 72 N.C. App. at 424
 
 ,
 
 324 S.E.2d at 913
 
 ("[T]he critical inquiry in determining whether North Carolina may assert
 
 in personam
 
 jurisdiction over a defendant is whether the assertion comports with due process."). "In each case, there must be some act by which the defendant purposefully avails himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws[.]"
 
 Tom Togs, Inc.
 
 ,
 
 318 N.C. at 365
 
 ,
 
 348 S.E.2d at 786
 
 . Where the particular controversy at issue "arises out of the defendant's contacts with the forum state, the state is said to be exercising 'specific' jurisdiction."
 
 Id.
 
 at 366,
 
 348 S.E.2d at 786
 
 . To establish "specific" jurisdiction, it must be evident that "a defendant has 'fair warning' that he may
 
 *459
 
 be sued in a state for injuries arising from activities that he 'purposefully directed' toward that state's residents."
 

 Id.
 

 (citation omitted).
 

 In the instant case, because the controversy arises from defendant Carr's alleged contacts with North Carolina, specific jurisdiction is at issue.
 

 Plaintiffs' complaint alleges, in pertinent part, that "Defendant Thomas A. Carr ... is an Authorized Trustee for FCP Fund" and that "the acts of FCP Fund, complained of herein, were at the direction, and under the control of Carr." Defendants did not attach to their motion to dismiss any evidence purporting to establish otherwise. Plaintiffs' allegation is therefore "accepted as true and deemed controlling."
 
 Parker
 
 ,
 
 243 N.C. App. at 97
 
 ,
 
 776 S.E.2d at 721
 
 . In that plaintiffs allege that defendant Carr directed and controlled each of the acts complained of in the instant case, plaintiffs have sufficiently disclosed the existence of personal jurisdiction over defendant Carr so as to survive dismissal under Rule 12(b)(2).
 
 See
 

 Wyatt v. Walt Disney World Co.
 
 ,
 
 151 N.C. App. 158
 
 , 165,
 
 565 S.E.2d 705
 
 , 710 (2002) ("Specific jurisdiction exists if the defendant has purposely directed its activities toward the resident[s] of the forum and the cause of action relates to such activities.");
 

 *158
 

 Inspirational Network, Inc. v. Combs
 
 ,
 
 131 N.C. App. 231
 
 , 236,
 
 506 S.E.2d 754
 
 , 758 (1998) (holding that the trial court properly denied the motion to dismiss for lack of personal jurisdiction over the individual defendants where the complaint included uncontroverted allegations that the principal corporation "was a sham and facade controlled and directed by" the individual defendants).
 

 Accordingly, we likewise reverse the trial court's dismissal of Counts Three, Four, and Five of plaintiffs' complaint to the extent that it was based in part upon a lack of personal jurisdiction against defendant Carr.
 

 Conclusion
 

 For the reasoning contained herein, the trial court's order granting defendants' motions to dismiss plaintiffs' claims for breach of contract, breach of statutory obligations, and unfair and deceptive trade practices is affirmed. We reverse the dismissal of plaintiffs' Counts Three, Four, and Five, plaintiffs' claims for breach of fiduciary duty and piercing the corporate veil, and remand to the trial court.
 

 AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
 

 Judges STROUD and MURPHY concur.
 

 [1]
 

 This language is in accordance with the requirements of N.C. Gen. Stat. § 47C-2-118, which directs that a termination agreement shall be executed "by the requisite number of unit owners"-i.e., in the instant case, Links Raleigh, as the eighty-percent owners, rather than
 
 between
 
 the requisite number of owners and some other entity, such as the Association. N.C. Gen. Stat. § 47C-2-118(b).
 

 [2]
 

 We also note that even absent the specific statutory language implicating the Association as "trustee," upon agreement by the majority owner to terminate the Condominium, plaintiffs were divested of any and all power to participate in negotiations for the sale of their property, and were left instead to the will of the Association.
 
 See
 

 Lockerman v. South River Elec. Membership Corp.
 
 , --- N.C. App. ----, ----,
 
 794 S.E.2d 346
 
 , 352 (2016) ("[W]hen one party figuratively holds all the cards-all the financial power or technical information, ... North Carolina courts [have] found that the special circumstance of a fiduciary relationship has arisen." (citation and quotation marks omitted) ).
 

 [3]
 

 We need not examine plaintiffs' "claims" for veil piercing as to the other counts, as those counts were properly dismissed.
 
 See
 

 Green v. Freeman
 
 ,
 
 367 N.C. 136
 
 , 146,
 
 749 S.E.2d 262
 
 , 271 (2013).