Barefoot v. Barefoot, 2022 NCBC 5.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 1788

ROBERT BRETT BAREFOOT,
individually and derivatively on
behalf of Robert and Sons, LLC,

Plaintiff,

v.

QUINT BAREFOOT; KB NC
HOLDINGS, LLC; SHAMROCK NC
HOLDINGS, LLC; GREGORY
WAYNE KISER; GAIL BUCHANAN;
KEITH BAREFOOT; HEATH
BAREFOOT; IRIS BAREFOOT; and
ROBERT AND SONS, LLC,

Defendants.

**ORDER AND OPINION ON
DEFENDANTS' JOINT MOTION TO
DISMISS FOR LACK OF SUBJECT
MATTER JURISDICTION AND
FAILURE TO STATE A CLAIM**

1. **THIS MATTER** is before the Court upon Defendants Quint Barefoot ("Quint"), KB NC Holdings, LLC ("KB"), Shamrock NC Holdings, LLC ("Shamrock"), Gregory Wayne Kiser ("Kiser"), Gail Buchanan ("Buchanan"), Keith Barefoot ("Keith"), Heath Barefoot ("Heath"), and Robert and Sons, LLC's ("R&S" or the "Company"; collectively, "Defendants")[1] Joint Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim (the "Motion") filed on 25 June 2021 in the above-captioned case. (ECF No. 32.)

2. The Motion seeks the dismissal of all of Plaintiff Robert Brett Barefoot's ("Brett") derivative and individual claims, which arise out of the 2018 sale of certain real property assets of the Company to KB.

---

[1] "Defendants" as defined here does not include Defendant Iris Barefoot ("Iris"), who is named as "a nominal defendant and/or a necessary party pursuant to Rule 19 of the North Carolina Rules of Civil Procedure." (Compl. ¶ 9, ECF No. 5.)

3. Having considered the Motion, the related briefing, the arguments of counsel at the hearing on the Motion, and other appropriate matters of record, the Court hereby **GRANTS** the Motion for the reasons set forth below.

*Lord Law Firm, PLLC, by Harrison A. Lord and Kevin G. Sweat, for Plaintiff Robert Brett Barefoot, individually and derivatively on behalf of Robert and Sons, LLC.*

*Tuggle Duggins P.A., by Jeffrey S. Southerland and Richard W. Andrews, for Defendants Quint Barefoot, Keith Barefoot, Heath Barefoot, and Robert and Sons, LLC.*

*Fox Rothschild LLP, by Gregory G. Holland, for Defendant Iris Barefoot.*

*Isaacson Sheridan, by Benjamin J. Rafte and Jennifer N. Fountain, for Defendants KB NC Holdings, LLC, Shamrock NC Holdings, LLC, Gregory Wayne Kiser, and Gail Buchanan.*

Bledsoe, Chief Judge.

I.

FACTUAL AND PROCEDURAL BACKGROUND

A. Factual Background

4. The Court does not make findings of fact when ruling on motions to dismiss under Rule 12(b)(1) of the North Carolina Rules of Civil Procedure ("Rule(s)"); rather, the Court recites only those facts that are relevant and necessary to the Court's determination of the Motion. *See Aldridge v. Metro. Life Ins. Co.*, 2019 NCBC LEXIS 53, at *8 (N.C. Super. Ct. Aug. 15, 2019).

5. Brett, Quint, Heath, and Keith are brothers; Iris is their mother. (Compl. ¶ 27.) As of 2014, the four brothers each held a 10.6% minority interest in R&S, and Iris, as trustee of the 2008 Iris B. Barefoot Living Trust, held a 57.6% majority

ownership interest.[2]  Iris was also the sole manager of the company.[3]  R&S was formed and operated for the purpose of holding, owning, and/or leasing real property, which included certain real property located at 501, 502, 503, and 519 Patton Avenue; 2500, 2504, and 2506 Fieldcrest Road; and 607 Mariner Road in Greensboro, North Carolina (the "Property").  (Compl. ¶¶ 32–35.)

6.     Kiser and Buchanan are managing members of both KB and Shamrock.[4] Brett alleges that Quint engaged in various business dealings with the KB Defendants and/or their affiliates prior to and after the 2018 sale of the Property. (*See* Compl. ¶¶ 86–98.)

7.     Non-party Shamrock Environmental Corporation ("SEC"), which Brett alleges is affiliated with the KB Defendants, leased the property located at 519 Patton Avenue from R&S.[5]  Brett claims that Quint informed Iris and other members of R&S that SEC could no longer meet its financial obligations under the lease and was considering termination of the lease in 2017.  (Compl. ¶ 41.)  During that same year, Brett alleges that the KB Defendants or their affiliates approached R&S, through Quint, about purchasing the Property.  (Compl. ¶ 38.)

---

[2] (*See* Br. Supp. Defs.' Joint Mot. Dismiss Lack of Subject Matter Jurisdiction & Failure State Claim [hereinafter "Defs.' Br. Supp."] Ex. C, Action of the Manager of R&S [hereinafter "2014 Manager Action"], ECF No. 33.4; *see also* Compl. ¶ 28.)

[3] (*See* Defs.' Br. Supp. Ex. B, Operating Agreement of R&S § 5.6 [hereinafter "Operating Agreement"], ECF No. 33.3.)

[4] (*See* Pl.'s Br. Opp'n Joint Mot. Dismiss Lack of Subject Matter Jurisdiction & Failure State Claim [hereinafter "Pl.'s Opp'n Br."] Ex. 2, ECF No. 36.2.)  The Court will hereafter refer to Kiser, Buchanan, KB, and Shamrock collectively as the "KB Defendants."

[5] (*See* Compl. ¶¶ 37, 40; *see also* Compl. Ex. 2, Agreement for Purchase and Sale of Real Property 13 [hereinafter "Purchase Agreement"], ECF No. 5.)

8.      According to Brett, Iris suffered from migraines in 2017 and 2018, the effects and treatment of which prevented her from taking effective legal action on behalf of R&S during that time. (*See* Compl. ¶ 53.) Brett alleges that Quint exploited Iris's poor health during this period, exerting undue influence to pressure her into selling the Property for an "unconscionably low" price. (*See* Compl. ¶¶ 55–56, 66–69, 80–83.) Specifically, Brett alleges that Quint failed to disclose to Iris (as well as to the other members of R&S) his business relationship with the KB Defendants and their affiliates and that he misrepresented SEC's ability to comply with the terms of the lease. (*See* Compl. ¶¶ 43, 107, 133, 139, 147, 194, 209.) Brett also claims that a picture of the 519 Patton Avenue property was featured in a 2017 appraisal of the other seven parcels included in the Property, thereby misleading Iris into believing that the 2017 appraisal valuation included the entire Property. (*See* Compl. ¶¶ 73–76.)

9.      R&S sold the Property to KB on 6 February 2018 for $2,800,000. (*See* Compl. ¶ 81.) Iris signed the Agreement for Purchase and Sale of Real Property (the "Purchase Agreement") for R&S as manager of the Company. (*See* Purchase Agreement 8.) Brett alleges that the fair market value of the Property at that time was "well in excess of $4,000,000.00, and likely between $5,000,000.00 to $6,000,000.00." (Compl. ¶ 82.) Brett learned of the transaction when he received his share of the proceeds from the sale as a distribution from R&S. (Compl. ¶ 64.)

B. Procedural History

10. Brett, Iris, and R&S commenced this action on 5 February 2021, one day before certain claims would be time-barred by the relevant statutes of limitations, by filing an Application and Order Extending Time to File Complaint (the "Application and Order"). (Appl. & Order Extending Time File Compl. [hereinafter "Appl. & Order"], ECF No. 3; *see also* Compl. ¶¶ 12, 16.) That same day, former counsel for Brett, Iris, and R&S sent a letter to Quint, Keith, Heath, and the KB Defendants (the "Letter"), requesting that the parties "discuss [the] circumstances surrounding the sale before engaging in protracted litigation" and sign a Tolling Agreement. (Defs.' Br. Supp. Ex. A [hereinafter "Letter"], ECF No. 33.2; *see also* Compl. ¶ 17.) The file-stamped Application and Order and a proposed Tolling Agreement were attached to the Letter. (*See* Letter; *see also* Compl. ¶ 17.)

11. Sometime between 5 and 25 February 2021, Iris decided not to join Brett in bringing suit, (*see* Compl. ¶¶ 13–16), so Brett alone filed the Complaint on 25 February 2021, seeking relief against Quint and the KB Defendants based on eight derivative claims and six individual claims, (*see generally* Compl.). Keith, Heath, and Iris were included as nominal defendants and/or necessary parties and R&S was included as a nominal defendant. (*See* Compl. ¶¶ 7–9, 11.)

12. Defendants filed their Motion on 25 June 2021. After full briefing, the Court held a hearing on the Motion on 19 August 2021 (the "Hearing"), at which all parties were represented by counsel. The Motion is now ripe for resolution.

II.

LEGAL STANDARD

13. Defendants' Motion challenges the adequacy of Brett's pre-suit demand in asserting his derivative claims and Brett's standing to bring direct claims based on an alleged fiduciary duty owed by Quint to Brett.

14. "Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction[,]" *In re Z.G.J.*, 2021-NCSC-102, ¶ 12 (citation omitted), and "must be addressed, and found to exist, before the merits of the case are judicially resolved[,]" *In re T.B.*, 200 N.C. App. 739, 742 (2009) (cleaned up). "[S]tanding arguments can be presented under both Rule 12(b)(1) and Rule 12(b)(6)[.]" *Finley v. Brown*, 2017 NCBC LEXIS 79, at *8 (N.C. Super. Ct. Sept. 1, 2017) (quoting *Sykes v. Health Network Sols., Inc.*, 2013 NCBC LEXIS 52, at *8 (N.C. Super. Ct. Dec. 5, 2013)).

15. "Rule 12(b)(1) requires the dismissal of any action 'based upon a trial court's lack of jurisdiction over the subject matter of the claim.'" *Watson v. Joyner-Watson*, 263 N.C. App. 393, 394 (2018) (quoting N.C. R. Civ. P. 12(b)(1)). The plaintiff bears the burden of establishing subject matter jurisdiction. *See Harper v. City of Asheville*, 160 N.C. App. 209, 217 (2003). In ruling on a motion to dismiss for lack of standing pursuant to Rule 12(b)(1), the Court "may consider matters outside the pleadings" in determining whether subject matter jurisdiction exists, *Harris v. Matthews*, 361 N.C. 265, 271 (2007), and must "view the allegations [of the complaint] as true and the

supporting record in the light most favorable to the non-moving party[,]" *Mangum v. Raleigh Bd. of Adjustment*, 362 N.C. 640, 644 (2008).

16.     In contrast, in ruling on a motion to dismiss under Rule 12(b)(6), the Court may only consider the pleading and "any exhibits attached to the [pleading,]" *Krawiec v. Manly*, 370 N.C. 602, 606 (2018), in order to determine "whether the pleadings, when taken as true, are legally sufficient to satisfy the elements of at least some legally recognized claim[,]" *Arroyo v. Scottie's Pro. Window Cleaning, Inc.*, 120 N.C. App. 154, 158 (1995).   Although the Court construes the pleading liberally and generally accepts all allegations as true, *see Laster v. Francis*, 199 N.C. App. 572, 577 (2009), the Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences[,]" *Good Hope Hosp., Inc. v. N.C. HHS, Div. of Facility Servs.*, 174 N.C. App. 266, 274 (2005) (citation omitted).   The Court may also ignore a party's legal conclusions set forth in its pleading.  *See McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 377 (2013).

17.     "Dismissal of an action under Rule 12(b)(6) is appropriate when the complaint 'fail[s] to state a claim upon which relief can be granted.' " *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 448 (2015) (alteration in original) (quoting N.C. R. Civ. P. 12(b)(6)).  The Supreme Court of North Carolina has determined that a "complaint fails in this manner when: '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses

some fact that necessarily defeats the plaintiff's claim.' " *Krawiec*, 370 N.C. at 606 (quoting *Wood v. Guilford Cnty.*, 355 N.C. 161, 166 (2002)).

## III.

## ANALYSIS

18. As an initial matter, the Court notes that Brett's first and second claims for relief—a demand for an accounting of R&S assets and a demand for access to company information and records—have been rendered moot because R&S has complied with these demands. (*See* Case Management Report 3, ECF No. 28; *see also* Defs.' Br. Supp. 2 n.1, ECF No. 33.) As a result, the Court will grant Defendants' Motion and dismiss these claims below.

### A. Brett's Derivative Claims

19. Brett has asserted derivative claims on behalf of R&S for (i) constructive fraud, constructive trust, embezzlement, and breach of fiduciary duty and the duties of loyalty, due care, and good faith against Quint; (ii) fraud and negligent misrepresentation against Quint and the KB Defendants; and (iii) breach of contract against the KB Defendants. Defendants move to dismiss all of Brett's derivative claims on the ground that he failed to make a proper pre-suit demand as required under N.C.G.S. § 57D-8-01(a)(2) and therefore lacks standing to pursue any claims on behalf of R&S. (*See* Defs.' Br. Supp. 2.) That provision requires that, prior to asserting a derivative claim, an LLC member must have:

> made written demand on the LLC to take suitable action, and either (i) the LLC notified the member that the member's demand was rejected, (ii) 90 days have expired from the date the demand was made, or (iii)

irreparable injury to the LLC would result by waiting for the expiration of the 90-day period.

N.C.G.S. § 57D-8-01(a)(2). "[T]he challenge to the adequacy of any pre-suit demand is, *inter alia*, a challenge to the Court's subject matter jurisdiction over the derivative claims." *Finley*, 2017 NCBC LEXIS 79, at *8 (quoting *Petty v. Morris*, 2014 NCBC LEXIS 67, at *4 (N.C. Super. Ct. Dec. 16, 2014)). " 'A party's standing to bring a derivative claim depends on' compliance with 'the demand requirement' in N.C. Gen. Stat. § 57D-8-01(a)(2)." *Azure Dolphin, LLC v. Barton*, 2017 NCBC LEXIS 90, at *20 (N.C. Super. Ct. Oct. 2, 2017) (quoting *Petty*, 2014 NCBC LEXIS 67, at *4), *aff'd*, 371 N.C. 579 (2018).

20.    The demand requirement exists to give an LLC the opportunity "to remedy the alleged problem without resort to judicial action, or, if the problem cannot be remedied without judicial action, to allow the [LLC], as the true beneficial party, the opportunity to bring suit first against the alleged wrongdoers." *Zoutewelle v. Mathis*, 2018 NCBC LEXIS 95, at *18 (N.C. Super. Ct. Sept. 13, 2018) (quoting *Bridges v. Oates*, 167 N.C. App. 459, 467–68 (2004)). Since demand is required to permit the LLC to take corrective action, it follows that the LLC must receive the demand to fulfill that statutory purpose. *See, e.g.*, *Kane v. Moore*, 2018 NCBC LEXIS 157, at *34–35 (N.C. Super. Ct. Nov. 26, 2018) (finding inadequate pre-suit demand based, in part, on absence of allegations of LLC's receipt and rejection of demand); *Miller v. Burlington Chem. Co., LLC*, 2017 NCBC LEXIS 6, at *27 (N.C. Super. Ct. Jan. 27, 2017) (finding relevant receipt of demand); *Petty*, 2014 NCBC LEXIS 67, at *19–21 (same).

21.     Here, Brett first argues that he was excused from the demand requirement of section 57D-8-01(a)(2) because, at the time the Application and Order was filed, both Iris and R&S were named plaintiffs in the suit. (*See* Pl.'s Opp'n Br. 9, ECF No. 36; *see also* Appl. & Order.) Brett contends that, although the Application and Order gave notice of potential derivative claims, Iris, as the manager and majority member of R&S, "could direct the Company to take action on its own behalf." (Pl.'s Opp'n Br. 9.) Alternatively, Brett argues that (i) the Letter sent to Quint, Keith, Heath, and the KB Defendants satisfied the demand requirement of section 57D-8-01(a)(2); (ii) Quint's refusal to enter into the Tolling Agreement constituted a rejection of the demand by R&S under section 57D-8-01(a)(2)(i); and (iii) due to the imminent lapsing of the relevant statutes of limitations, "irreparable injury to the LLC would result by waiting for the expiration of the 90-day period." (Pl.'s Opp'n Br. 10–14 (quoting N.C.G.S. § 57D-8-01(a)(2)).)

22.     In opposition, Defendants contend that Brett was not excused from complying with the demand requirement of section 57D-8-01(a)(2) and, additionally, that the Letter did not constitute a proper demand under the statute for three reasons.[6] First, Defendants argue that the Letter was sent after the lawsuit was initiated. (*See* Defs.' Br. Supp. 7, 10; *see also* Defs.' Reply 3.) Second, Defendants contend that the Letter was sent to three of the five members of R&S rather than to the Company itself, so R&S could not properly reject it. (*See* Defs.' Br. Supp. 10–11; *see also* Defs.' Reply 3.) Third, Defendants argue that Brett failed to demonstrate

---

[6] (*See* Defs.' Br. Supp. 6–7, 9–12; Reply Supp. Defs.' Joint Mot. Dismiss Lack of Subject Matter Jurisdiction & Failure State Claim 2–4 [hereinafter "Defs.' Reply"], ECF No. 43.)

that any "irreparable injury . . . would result by waiting for the expiration of the 90-day [response] period" otherwise required by section 57D-8-01(a)(2). (Defs.' Br. Supp. 11–12 (quoting Compl. ¶ 22).) For these reasons, Defendants argue, Brett lacks standing to bring derivative claims on behalf of R&S.

23. The Court agrees with Defendants.

24. Although the events that transpired between the filing of the Application and Order and the Complaint make the procedural posture of this case somewhat odd, the fact that R&S was a party plaintiff at the time this suit was commenced does not excuse Brett from complying with the demand requirement of section 57D-8-01(a)(2) when purporting to bring derivative claims on behalf of the Company. To be sure, R&S could have asserted direct claims "in its own right" as a party plaintiff. (*See* Pl.'s Opp'n Br. 9.) However, to bring derivative claims on behalf of an LLC, a member must comply with the statutory demand requirement of Chapter 57D. *See In re Harris Teeter Merger Litig.*, 2014 NCBC LEXIS 47, at *14 (N.C. Super. Ct. Sept. 24, 2014) ("[T]he failure to make demand is fatal.").

25. Demand is a pre-suit requirement. *See, e.g.*, *Garlock v. Hilliard*, 2000 NCBC LEXIS 6, at *9 (N.C. Super. Ct. Aug. 22, 2000) ("In determining whether the demand requirement has been met the Court must compare the derivative claims asserted in a complaint against the specific demands a plaintiff has made *prior to filing suit*." (emphasis added) (citation omitted)); *Kane*, 2018 NCBC LEXIS 157, at *14 ("The *pre-suit* demand required by section 57D-8-01(a) 'must be made with sufficient clarity

and particularity . . . .' " (emphasis added)). Although a civil action is generally commenced with the filing of a complaint, Rule 3 states that:

> A civil action may also be commenced by the issuance of a summons when (1) [a] person makes application to the court stating the nature and purpose of his action and requesting permission to file his complaint within 20 days and (2) [t]he court makes an order stating the nature and purpose of the action and granting the requested permission.

N.C. R. Civ. P. 3; *see also Sink v. Easter*, 284 N.C. 555, 558 (1974) (holding that filing an application and order extending time to file a complaint commences an action); *Wooten v. Warren*, 117 N.C. App. 350, 353 (1994) (same).

26. Here, Brett, Iris, and R&S made application to the Mecklenburg County Superior Court under Rule 3, which the Mecklenburg Assistant Clerk of Superior Court granted on 5 February 2021. (*See* Appl. & Order.)[7] Later that same day, former counsel for Brett, Iris, and R&S sent the Letter to Quint, Keith, Heath, and the KB Defendants. (*See* Letter.) Former counsel clearly noted that the Letter was in reference to the lawsuit captioned "***Robert and Sons, LLC, et. al. v. Quint Barefoot, et. al.***" and enclosed a copy of the file-stamped Application and Order. (*See* Letter.) Because the filing of the Application and Order commenced this litigation, the Letter did not constitute a *pre-suit* demand as required by section 57D-8-01(a)(2).

27. In addition to its untimeliness, the Letter was not sent to R&S. For a demand to be effective, the member must make "written demand *on the LLC*[.]" N.C.G.S. § 57D-8-01(a)(2) (emphasis added). Delivery to the LLC must be made to "a person or entity that has authority to cause the LLC to reject the demand" or through

---

[7] This action was later designated as a mandatory complex business case on 26 March 2021. (ECF No. 1.)

its registered agent. Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 34.04[5], at n.61.1 (7th ed. 2018) [hereinafter *"Robinson on Corporation Law"*]; *see also Hilco Transp., Inc. v. Atkins*, 2016 NCBC LEXIS 5, at *13 (N.C. Super. Ct. Jan. 15, 2016) (requiring that proper demand be addressed to "someone with authority to act on behalf of the corporation").

28. Section 12.1 of the Operating Agreement of R&S (the "Operating Agreement") provides that "any notice, payment, *demand*, or communication required or permitted to be given by any provision of this Agreement shall be in writing and . . . addressed as follows: if to the Company, to its principal office address[.]" (Operating Agreement § 12.1 (emphasis added).) The Operating Agreement goes on to state that R&S's principal office address is "Iris B. Barefoot, 7 Elm Grove Court, Greensboro, North Carolina 27401." (Operating Agreement § 1.5.) Brett alleges that Iris, the majority member and manager of R&S, was "copied on the [Letter,]" (Compl. ¶ 17), but neither Iris's name nor the Elm Grove Court address appears in the Letter, (*see* Letter). The Court further notes that while the 2014–17 annual reports for R&S on file with the North Carolina Secretary of State include a different address—828 Knox Road, McLeansville, North Carolina 27301-9227—as the Company's principal office address, (*see* Pl.'s Opp'n Br. Ex. 1 [hereinafter "Annual Reports"], ECF No. 36.1), this address is not set forth in the Letter either, (*see* Letter).

29. The Letter is instead addressed to the KB Defendants, Quint, Keith, and Heath. (*See* Letter.) The KB Defendants are not affiliated with R&S and thus are not in a position to make the Company take any action. Moreover, Quint, Keith, and

Heath, each a 10.6% minority member, did not possess the requisite authority, either individually or collectively, to reject a demand on behalf of R&S. (*See* Operating Agreement § 6.1 ("Unless authorized to do so by this Agreement or by the Managers, no Member . . . of the Company shall have the actual or apparent authority to . . . take any action purporting to be on behalf of the Company.").)

30. Brett nonetheless argues that delivery on the Company was effective because Quint also served as a manager of R&S and, as such, possessed the requisite authority to cause the Company to reject a demand. (*See* Pl.'s Opp'n Br. 11.) Brett alleges that, "[u]pon information and belief," Quint served as a manager of R&S, but provides no additional facts to support this allegation. (Compl. ¶ 29; *see also* ¶¶ 85, 105, 128, 144.) Perhaps recognizing that fact, Brett appends four annual reports on file with the North Carolina Secretary of State[8] to his Brief in Opposition to the Motion (the "Opposition"), which Quint filed on behalf of the Company as its "manager," in support of his argument that Quint had the authority to reject a demand made upon R&S. (*See* Annual Reports; *see also* Pl.'s Opp'n Br. 11.)

31. But even if Quint were a manager of R&S, Quint still did not possess sufficient authority to reject a demand made on the Company. The Company's Operating Agreement specifically provides that: "When more than one (1) Manager is serving, . . . the majority vote, consent, approval or ratification of the Managers then serving shall be required to bind the Managers and to represent action by or on

---

[8] Brett correctly notes that "[t]he Court may take judicial notice of public filings available on the North Carolina Secretary of State's official website." *Banc of Am. Merch. Servs., LLC v. Arby's Rest. Grp., Inc.*, 2021 NCBC LEXIS 60, at *5 n.3 (N.C. Super. Ct. June 30, 2021).

behalf of the Company." (Operating Agreement § 5.1.) Because Brett concedes that Iris was a manager of R&S,[9] (*see* Pl.'s Opp'n Br. Ex. 3 ¶¶ 20, 25 [hereinafter "Brett Aff."], ECF No. 36.3), any rejection of a demand made on the Company would need to be made by *both* Quint and Iris to be effective. Therefore, the Letter did not constitute an effective demand on R&S because Quint, in his role as a manager, did not have the individual "authority to cause the LLC to reject the demand[.]"[10] *Robinson on Corporation Law* § 34.04[5], at n.61.1.

32.   Lastly, Brett has also failed to demonstrate that any "irreparable injury to the LLC would result by waiting for the expiration of the 90-day [response] period" required by section 57D-8-01(a)(2). Brett contends that "[e]ntering into the tolling

---

[9] There is also ample support for this fact in the record. The Operating Agreement clearly states that "Iris B. Barefoot is designated as the Manager of the Company." (Operating Agreement § 5.6.) In a 2014 written consent, Iris signed the document as the sole manager. (*See* 2014 Manager Action.) Iris's initials appear at the bottom of pages 1–7 of the Purchase Agreement and, under the signature block for the seller, the name "Quint" is crossed out as the manager, the name "Iris" is hand-written above his name, and Iris signed the contract as manager for R&S. (*See* Purchase Agreement 1–8.) The two deeds that effectuated the transfer of the Property from R&S to KB are signed by Iris—again as manager. (*See* Defs.' Br. Supp. Ex. D, ECF No. 33.5.) The Court additionally notes that although Brett alleges that Iris "lacked legal capacity" to make decisions and sign legal documents on behalf of R&S during the relevant time period "as a result of migraines and related medication[,]" (*see* Compl. ¶¶ 53–54, 56, 65–66, 136; *see also* Pl.'s Opp'n Br. 4, 6, 22), the record is devoid of evidence to support this conclusory allegation and the Court need not accept it as true. *See, e.g.*, *Venable v. GKN Auto.*, 107 N.C. App. 579, 584 (1992) (affirming dismissal under Rule 12(b)(1) where plaintiff's allegations were "conclusory in nature"); *see also Neuse River Found., Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 113 (2002) ("Since [the elements of standing] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof[.]"), *overruled on other grounds by Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 376 N.C. 558 (2021).

[10] The Court also notes that service on the Company's registered agent would have constituted an effective demand under the statute, *see Petty*, 2014 NCBC LEXIS 67, at *17–18, but the Company's registered agent is not listed as one of the recipients of the Letter and there is no evidence of record that the Letter was sent to the registered agent. (*Compare* Annual Reports, *with* Letter.)

agreement was necessary to preserve the Company's claims" that otherwise may have been barred by the relevant statutes of limitations. (Pl.'s Opp'n Br. 12.) Brett further argues that a tolling agreement would have given R&S the opportunity to "remedy the alleged problem without resort to judicial action, or . . . to bring suit first against the alleged wrongdoers." (Pl.'s Opp'n Br. 12 (quoting *Bridges*, 167 N.C. App. at 467–68 (citation omitted)).)

33.    While the Court agrees that a tolling agreement would have been necessary to preserve the Company's claims if Brett had sought to comply with the ninety-day response period required by section 57D-8-01(a), Brett instead commenced this lawsuit by filing the Application and Order. In doing so, he made a tolling agreement superfluous. Not only could a tolling agreement no longer enable the parties to "avoid judicial action" as Brett contends—as noted, the filing of the Application and Order initiated the judicial action—but in bringing this lawsuit, R&S, Iris, and Quint tolled all statutes of limitations on the claims asserted. *See, e.g.*, *Carl Rose & Sons Ready Mix Concrete, Inc. v. Thorp Sales Corp.*, 36 N.C. App. 778, 780 (1978) (noting that "[n]ormally, the statute of limitations is tolled when legal action is commenced").

34.    Moreover, Brett's claims of irreparable injury ring particularly hollow here. Not only does he allege that he received notice of the challenged sale in June 2018, (*see* Compl. ¶ 64 ("Brett had no knowledge that the sale of the Property occurred until after the sale of the Property had closed, when the Company distributed the proceeds of the sale."); Letter ("[T]he shareholders of [R&S] did not receive any proceeds from the Property's sale until June 2018[.]")), but he also avers that he learned of

"numerous irregularities and suspicious circumstances in the sale of the Property" "in the spring of 2020," (Brett Aff. ¶ 11). Yet he waited until the day before applicable statutes of limitations expired to initiate suit and make his improper and untimely demand. It would appear, therefore, that any injury Brett claims to have suffered due to the running of statutes of limitations at the time he made his purported demand was caused by Brett's failure to act when he became aware of these alleged facts and for no other reason.

35. The Court therefore concludes that because R&S did not face any "irreparable injury," Brett was not excused from complying with the ninety-day demand requirement of section 57D-8-01(a)(2).

36. For the reasons discussed above, the Court finds that Brett does not have standing to pursue his derivative claims on behalf of R&S due to his failure to comply with the pre-suit demand required by section 57D-8-01(a) and will therefore grant the Motion and dismiss Brett's derivative claims without prejudice.

B.   Brett's Individual Claims

37. The Court now turns to Brett's individual claims against Quint for (i) breach of fiduciary duty and the duties of loyalty, due care, and good faith; (ii) constructive fraud; (iii) constructive trust; (iv) embezzlement; and (v) fraud. Because Defendants seek dismissal of Brett's individual claims under both Rule 12(b)(1) and Rule 12(b)(6), (*see* Defs.' Br. Supp. 2, 16–23), the Court will analyze his claims under both standards, beginning with Defendants' challenge to Brett's standing to bring his individual claims under Rule 12(b)(1).

38.     It is a well-settled principle of North Carolina law that "[s]hareholders . . . of corporations generally may not bring individual actions to recover what they consider their share of the damages suffered by the corporation." *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 660 (1997) (quoting *Taha v. Engstrand*, 987 F.2d 505, 507 (8th Cir. 1993)); *see also Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 612 (2018). Our courts recognize two exceptions to this rule: shareholders may bring an individual action when "(1) the wrongdoer owed them a special duty or (2) they suffered a personal injury distinct from the injury sustained by the corporation itself." *Corwin*, 371 N.C. at 612 (cleaned up). Both the general rule and its exceptions "are equally applicable in the LLC context." *White v. Hyde*, 2016 NCBC LEXIS 74, at *18 (N.C. Super. Ct. Oct. 4, 2016).

39.     Under the special duty exception, "the duty must be one that the alleged wrongdoer owed directly to the shareholder as an individual." *Barger*, 346 N.C. at 659. The plaintiff must allege facts from which it may be inferred that "defendants owed a duty to plaintiff[ ] that was personal to plaintiff[ ] as [a member] and was separate and distinct from the duty defendants owed the [LLC,]" such as a breach of a fiduciary duty owed to the member. *Id.* A fiduciary relationship is one in which

> there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence, and it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other.

*Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 472 (2009) (cleaned up); *see also, e.g.*, *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 340 (2019) (to similar effect).

40. Brett argues that he has standing to bring his individual claims under the special duty exception, identifying three bases on which he asserts that Quint owed him a fiduciary duty. (*See* Pl.'s Opp'n Br. 18–23.)

41. Brett first contends that his fraternal relationship with Quint formed "the bedrock of the trust and confidence Brett reposed in Quint[,]" (Pl.' Opp'n Br. 18; *see also* Compl. ¶¶ 129–30), but correctly concedes that, without more, a sibling relationship is insufficient to support the existence of a fiduciary relationship, (*see* Pl.'s Opp'n Br. 18). *See, e.g.*, *White*, 2016 NCBC LEXIS 74, at *20–21.

42. Brett next argues that Quint owed him a fiduciary duty as the trustee of various unrelated trusts of which Brett or Brett's children are beneficiaries. (*See* Pl.'s Opp'n Br. 19–20; Compl. ¶ 130; Brett Aff. ¶¶ 4–7.) While it is true that "one of the most fundamental duties of a trustee throughout a trust relationship is to maintain complete loyalty to the interests of his beneficiaries[,]" *Howe v. Links Club Condo. Ass'n*, 263 N.C. App. 130, 149 (2018) (cleaned up), that duty is only with regard to the management and administration of the trust, *see In re Testamentary Tr. of Charnock*, 158 N.C. App. 35, 42 (2003) ("Trust beneficiaries may expect and demand the trustee's complete loyalty *in the administration of any trust.*" (emphasis added) (citation omitted)). Quint owes Brett (and Brett's children) a fiduciary duty to administer these trusts in his (and their) best interests. But this trustee appointment does not make Quint Brett's fiduciary as to all matters, including with respect to their roles as minority members of R&S, and therefore does not qualify as a "special duty" that would provide Brett standing to pursue his individual claims against Quint.

43.     Brett's last argument for establishing a fiduciary relationship with Quint is based on Quint's alleged exercise of "actual domination and control" over R&S, both as the "*de facto* majority member" and as a manager of the Company.  (Pl.'s Opp'n Br. 16, 20–23.)  Brett's Opposition does not distinguish between the fiduciary duty of a majority member and that of a manager.  (*See* Pl.'s Opp'n Br. 20–23.)  Because those duties are different, the Court will examine whether Brett has shown that Quint owes him a fiduciary duty first as a manager and, second, as a *de facto* majority member of R&S.

44.     In the corporate context, directors generally owe fiduciary duties to the corporation rather than to the individual shareholders such that "[w]hen these fiduciary duties are breached, a shareholder may sue the offending director in a derivative action."  *Green v. Freeman*, 367 N.C. 136, 141 (2013).  Indeed, the drafters of the 1990 North Carolina Business Corporation Act specifically "intended to avoid stating [that] a duty [was] owed directly by the directors to the shareholders [because] that might be construed to give shareholders a direct right of action on claims that should be asserted derivatively."  *Robinson on Corporation Law* § 14.01[2]; *see also* N.C. Commentary § 55-8-30 (1989) (second paragraph) ("The drafters decided not to bring forward the words 'and to its shareholders' in order to avoid an interpretation that there is a duty running directly from directors to the shareholders that would give shareholders a direct right of action on claims that should be asserted derivatively.").

45. This same reasoning carries over to the LLC context. Managers of an LLC usually owe a fiduciary duty to the company, not to the LLC's individual members, and "where it is alleged that [managers] have breached this duty, the action is properly maintained *by the [LLC]* rather than any individual . . . [member]." *Kaplan*, 196 N.C. App. at 474 (quoting *Governors Club, Inc. v. Governors Club Ltd. P'ship*, 152 N.C. App. 240, 248 (2002)); *see also* N.C.G.S. § 57D-3-21(b). But, unlike a corporation, "[a]n LLC is primarily a creature of contract[,]" *Finkel v. Palm Park, Inc.*, 2019 NCBC LEXIS 38, at *25 (N.C. Super. Ct. June 11, 2019) (quoting *Crouse v. Mineo*, 189 N.C. App. 232, 237 (2008)), and "[t]he operating agreement governs the internal affairs of an LLC and the rights, duties, and obligations of . . . the company officials in relation to each other, the LLC, and the interest owners[,]" N.C.G.S. § 57D-2-30(a).

46. Although not clearly stated in his Opposition, Brett argued at the Hearing that the language of the Operating Agreement purports to extend the managers' fiduciary duty to the Company to the LLC's members as well. (*See* Pl.'s Opp'n Br. 22–23.) In relevant part, the Operating Agreement provides that:

> [T]he Managers shall conduct the business of the Company in good faith and with the care that an ordinary, prudent person would exercise in a like position, under similar circumstances and in a manner the Manager reasonably believes to be in the best interests of the Company *and the Members*, including the safekeeping and use of all Company funds and other Company Assets for the exclusive benefit of the Company *and the Members*.

(Operating Agreement § 5.4 (emphasis added).) Brett argues that this provision's inclusion of the phrase "and the Members" was "intended to protect the disinterested

members (including Brett) from self-dealing by other members and/or managers" and "provide[ ] protections for members that Quint disregarded." (Pl.'s Opp'n Br. 23.)

47. The Court finds this argument unpersuasive. The phrase "the Company and the Members" in Section 5.4 of the Operating Agreement parallels the language of former N.C.G.S. § 55-35: "Officers and directors shall be deemed to stand in a fiduciary relation to *the corporation and to its shareholders.*" *Robinson on Corporation Law* § 14.01[2] n.11 (emphasis added) (quoting N.C.G.S. § 55-35 (1989)). But, as noted above, the decision to remove the words "to its shareholders" from the final version of N.C.G.S. § 55-8-30 was intended to clarify and "avoid an interpretation that there is a duty running directly from directors to the shareholders that would give shareholders a direct right of action[.]" N.C. Commentary § 55-8-30 (1989) (second paragraph). Therefore, in the LLC context, the inclusion of the phrase "and the Members" is not reasonably interpreted to create a duty running directly from the managers to the members that would give members a direct right of action.

48. Because "[t]he rights and duties of LLC members [and company officials] are ordinarily governed by the company's operating agreement, not by general principles of fiduciary relationships[,]" *Pender Farm Dev., LLC v. NDCO, LLC*, 2020 NCBC LEXIS 43, at *33 (N.C. Super. Ct. Apr. 7, 2020) (alteration in original) (quoting *Strategic Mgmt. Decisions v. Sales Performance Int'l*, 2017 NCBC LEXIS 69, at *10–11 (N.C. Super. Ct. Aug. 7, 2017)), the members of R&S could have provided in the Operating Agreement that the managers owed a fiduciary duty to both the Company and the members, *see, e.g.*, *id.* at *33–34 (concluding that a manager owed the

members a fiduciary duty where the operating agreement specifically provided that "[t]he duties of the [m]anagers to [the LLC] and the [m]embers are of a fiduciary nature" (first, second, and fourth alterations in original)); *Finkel*, 2019 NCBC LEXIS 38, at *31 (recognizing a fiduciary duty owed by the managers to the members based on the following language in the operating agreement: "[The managers shall] [b]e under a fiduciary duty to conduct the affairs of [the LLC] in the best interests of the Company and of the Members" (first, second, and fourth alterations in original)). But they did not, and, as pleaded here, any claim for an alleged breach of duty by Quint, as a manager of R&S, accrued to the Company derivatively rather than to Brett, as a member, individually.

49.     The Court now turns to Brett's argument that Quint owed him a fiduciary duty as the *de facto* majority member of R&S. Although members of an LLC generally do not owe a fiduciary duty to each other or to the company, majority members do owe a fiduciary duty to minority members. *See Kaplan*, 196 N.C. App. at 473. Similarly, in the corporate context, the majority stockholder of a corporation owes fiduciary duties to minority stockholders. *See Corwin*, 371 N.C. at 616 (citing *Gaines v. Long Mfg. Co.*, 234 N.C. 340, 344 (1951)). But while our Supreme Court "has never held that a *minority* stockholder owes fiduciary duties to other stockholders, . . . it has also never held that a minority stockholder *cannot* owe fiduciary duties to other stockholders." *Corwin*, 371 N.C. at 616. Although the Supreme Court determined that resolution of that question was unnecessary to resolve the issue presented in *Corwin*, it applied the Delaware controlling-stockholder standard and discussed at

length the showing necessary to demonstrate that a minority stockholder exercised the necessary control to be considered a "controlling stockholder":

> In Delaware, it is well settled law that only a 'controlling stockholder' owes fiduciary duties to other stockholders. A stockholder is considered controlling if it owns more than 50% of the corporation's voting power or if it exercises control over the business and affairs of the corporation. Put another way, a minority stockholder is considered a controlling stockholder if the minority stockholder exercises dominion through actual control of corporate conduct. This inquiry focuses on actual control over the board of directors. Actual control exists only when the allegedly controlling stockholder exercises such formidable voting and managerial power that it, as a practical matter, is no differently situated than if it had majority voting control. As a necessary prerequisite for a minority stockholder to exercise actual control, then, the stockholder's power must be so potent that independent directors cannot freely exercise their judgment, fearing retribution.
>
> To survive a motion to dismiss in Delaware, a claim for breach of fiduciary duty by a minority stockholder must contain more than the bare conclusory allegation that a minority stockholder possessed control. Rather, the complaint must contain well-pled facts showing that the minority stockholder exercised actual domination and control over the directors. Even at the motion to dismiss stage, Delaware courts have noted that this actual control test is not an easy one to satisfy as stockholders with very potent clout have been deemed, in thoughtful decisions, to fall short of the mark.

*Id.* at 616–17 (cleaned up). Using this framework, the Court concludes that the Complaint does not adequately allege that Quint exercised actual control over the Company's manager and majority member, Iris.

50. Because Quint owns far less than 50% of the Company's voting power, Brett must demonstrate that Quint exercised actual control over R&S in the form of "such formidable voting and managerial power that [he], as a practical matter, [is] no differently situated than if [he] had majority voting control." *Id.* (second alteration in original) (quoting *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 993

(Del. Ch. 2014)). In his Complaint, Brett alleges numerous times, in conclusory fashion, that Quint exercised actual domination and control over the Company, (*see, e.g.*, Compl. ¶¶ 106, 108, 132, 136–38), and that the sale of the Property and Iris's signatures on the associated documents were procured as a result of Quint's fraud and undue influence over Iris, (*see, e.g.*, Compl. ¶¶ 49, 55, 66, 80, 83–84, 106, 108, 136). But the Complaint contains few, if any, details to explain *how* Quint controlled the Company and Iris and *how* he engaged in this alleged wrongdoing. (*See, e.g.*, Compl. ¶¶ 31, 52 (other members relied on Quint's knowledge and expertise); ¶ 38 (upon information and belief, Quint informed R&S of the KB Defendants' interest in purchasing the Property); ¶¶ 41–42, (upon information and belief, Quint informed R&S that, according to Kiser and Buchanan, SEC was considering terminating its lease of the 519 Patton Avenue property or moving to another location); ¶ 46 (upon information and belief, Quint previously arranged for a reduction in SEC's rental payments); ¶¶ 50, 57, 60 (Quint communicated information about the proposed sale to the other members).) While these allegations demonstrate that Quint may have played a more active role in R&S than his brothers, even taken together, they do not come close to showing "formidable" managerial control over the Company. *Cf. Pender Farm Dev., LLC*, 2020 NCBC LEXIS 43, at \*35–37 (concluding the record contained sufficient evidence of manager's "extensive" involvement with the LLC to create question of fact as to whether a *de facto* fiduciary relationship existed between the manager and the members).

51. Brett additionally alleges that Quint "misinformed Iris as to the value of the Property" by featuring a picture of the 519 Patton Avenue property on a 2017 appraisal of the other seven properties, (Compl. ¶¶ 56, 67; *see also* ¶¶ 75–76); however, the Complaint, as pleaded, does not allege that *Quint* prepared the appraisal and/or requested inclusion of the picture. Instead, the Complaint merely alleges that Quint was "aware" of its inclusion in the 2017 appraisal, (*see* Compl. ¶ 77), such that this action cannot properly be attributed to Quint.

52. The Court further notes that while Quint's alleged failure to disclose his relationship and various business dealings with the KB Defendants to Iris and the other members of the Company may constitute a violation of the Operating Agreement,[11] (*see* Pl.'s Opp'n Br. 22–23; *see also* Compl. ¶¶ 80, 84–86, 107, 134, 139, 147, 194–99), this alleged inaction still does not provide the Court with any details as to how Quint exercised actual domination and control over Iris and her actions as manager.

---

[11] As the Opposition correctly notes, the Operating Agreement states that

> no Member or Manager shall engage in any transaction with the Company in which the Member or Manager has a direct or indirect interest unless such transaction is authorized, approved or ratified by a majority of disinterested Managers or, if there are none, by Majority in Interest of the disinterested Members knowing the material facts of the transaction and the Member's interest.

(Operating Agreement § 5.4.) However, the Operating Agreement further states that "any Member or Managing Member may engage independently or with others in other business ventures, or make or manage other investments, without the necessity of informing the Company or the other Members. . . . [T]he pursuit of such ventures shall not be deemed wrongful or improper." (Operating Agreement § 6.3.) The Court need not decide whether Quint had a duty to disclose and/or whether the sale was nevertheless "authorized, approved or ratified" by Iris as the "Majority in Interest," because this issue is not before the Court.

53.    Because the Complaint relies on conclusory allegations rather than "well-pled facts," Brett has failed to demonstrate that Quint exercised "formidable voting and managerial power" over Iris and the Company and, therefore, has not pleaded sufficient facts to show that Quint is a *de facto* majority member. *Corwin*, 371 N.C. at 617 ("[A] claim for breach of fiduciary duty by a minority stockholder must contain more than the bare conclusory allegation that a minority stockholder possessed control. Rather, the complaint must contain well-pled facts showing that the minority stockholder exercised actual domination and control over the directors." (cleaned up)); *see also Neuse River Found., Inc*, 155 N.C. App. at 113 (noting that the elements of standing must be supported "in the same way as any other matter on which the plaintiff bears the burden of proof"); *Venable*, 107 N.C. App. at 584 (affirming dismissal under Rule 12(b)(1) where plaintiff's allegations were "conclusory in nature"). As a minority member, without more, Quint does not owe Brett, or any other member of R&S, a fiduciary duty. *See Kaplan*, 196 N.C. App. at 473. Brett therefore lacks standing to pursue his individual claims against Quint because he has failed to plead facts showing that Quint owed him a fiduciary or other special duty. Accordingly, the Court will grant Defendants' Motion to dismiss as to those claims.[12]

---

[12] The Court notes that even if Brett did have standing to bring his individual claims, the Complaint still fails to state a claim upon which relief can be granted under Rule 12(b)(6). Brett's individual claims for breach of fiduciary duty and constructive fraud fail because the Complaint has not adequately pleaded the existence of a fiduciary duty. Brett's individual claim for fraud also fails because it is based on Quint's alleged fiduciary duty to disclose information to Brett. Lastly, Brett's individual claim for embezzlement fails both because Quint did not owe Brett a fiduciary duty and because Brett seeks recovery of Company, rather than personal, assets.

C.    Brett's Claims for Constructive Trust and Civil Conspiracy

54.    Finally, Defendants seek to dismiss Brett's claims for constructive trust and civil conspiracy because each of the underlying claims on which these claims are premised are subject to dismissal and, additionally, because a constructive trust is not a standalone claim for relief. (Defs.' Br. Supp. 2 n.2, 24.)  The Court agrees.

55.    Defendants are correct that the imposition of a constructive trust is a remedy, not a standalone claim. *See LLG-NRMH, LLC v. N. Riverfront Marina & Hotel, LLLP*, 2018 NCBC LEXIS 105, at *14 (N.C. Super. Ct. Oct. 9, 2018) ("[A] constructive trust is not a standalone claim for relief or cause of action."). Accordingly, the Court will grant Defendants' Motion to dismiss Brett's purported claims for constructive trust.

56.    "To create civil liability for conspiracy there must have been a wrongful act resulting in injury to another committed by one or more of the conspirators pursuant to the common scheme and in furtherance of the objective." *Krawiec*, 370 N.C. at 613 (quoting *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 444 (2008)).  "[A] complaint sufficiently state[s] a claim for civil conspiracy when it allege[s] (1) a conspiracy, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy." *Ridgeway Brands Mfg., LLC*, 362 N.C. at 444.

57.    Brett bases his civil conspiracy claim against Quint and the KB Defendants on the "unlawful activity described" in the Complaint.  (Compl. ¶ 111.)  Because the Court has determined that all of Brett's underlying claims must be dismissed, those

claims cannot provide a basis for Brett's civil conspiracy claim. *See, e.g.*, *Krawiec*, 370 N.C. at 615 (dismissing civil conspiracy claim where the claims alleged as the underlying wrongful acts were dismissed); *see also, e.g.*, *USA Trouser, S.A. de C.V. v. Williams*, 258 N.C. App. 192, 201 (2018) ("A civil conspiracy claim must be based on an adequately pled underlying claim."). As a result, the Court concludes that Brett's claim for civil conspiracy is not supported by the requisite wrongful acts and must therefore be dismissed. *See, e.g.*, *New Bar P'ship v. Martin*, 221 N.C. App. 302, 310 (2012) ("[W]here a plaintiff's underlying claims fail, its claim for civil conspiracy must also fail." (citation and internal quotation marks omitted)).

## IV.

## CONCLUSION

58. **WHEREFORE**, the Court, for the reasons set forth above, hereby **GRANTS** Defendants' Motion, and, accordingly, Brett's derivative claims against Quint and the KB Defendants are hereby **DISMISSED**, under Rule 12(b)(1), without prejudice, and Brett's individual claims against Quint and the KB Defendants are hereby **DISMISSED**, under Rules 12(b)(1) and 12(b)(6), without prejudice.[13]

**SO ORDERED**, this the 2nd day of February, 2022.[14]

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge

---

[13] "A dismissal for lack of [subject matter] jurisdiction is generally a dismissal without prejudice." *N.C. Acupuncture Licensing Bd. v. N.C. Bd. of Physical Therapy Exam'rs*, 2016 NCBC LEXIS 33, at *27 n.8 (N.C. Super. Ct. Apr. 16, 2016).

[14] Because Brett has asserted claims for relief against Quint and the KB Defendants and no other Defendant, the Court's ruling dismisses all pending claims in this action.